MILBERG, WEISS, BERSHAD, HYNES, and LERACH, LLP; Niblock Law Firm; and Law Offices of Steven E. Cauley, P.A. *v.* STATE of Arkansas; Phillip Morris, Inc.; R.J. Reynolds Tobacco Company; Brown and Williamson Tobacco Corporation, Individually and as Successor by Merger to American Tobacco Company; and Lorillard Tobacco Company

99-1458 28 S.W.3d 842

Supreme Court of Arkansas
Opinion delivered October 12, 2000
[Petition for rehearing denied November 16, 2000.]

*Milberg, Weiss, Bershad, Hynes & Lerach, LLP*, by: *Patrick J. Coughlin* and *Frank J. Janacek, Jr.*; *The Niblock Law Firm*, by: *George H. Niblock*; and *Law Offices of Steven E. Cauley, P.A.*, by: *Steven E. Cauley*, for appellants.

*Mark Pryor*, Att'y Gen., by: *Sammye L. Taylor,* Deputy Att'y Gen., and *Brian G. Brooks*, Ass't Att'y Gen., for appellee State of Arkansas.

*Hunton & Williams*, by: *Douglas W. Davis*; and *Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.* by: *R.T. Beard, III*, for certain appellees.

D ONALD L. CORBIN, Justice. The issues in this case are (1) whether an attorney may intervene in a client's settlement, after the entry of final decree, for the purpose of affecting the terms of that settlement, and (2) whether an attorney has standing

to set aside a consent decree approving a client's settlement. Appellants in this case are three law firms: Milberg, Weiss, Bershad, Hynes, and Lerach, LLP, from San Diego (Milberg-Weiss); the Niblock Law Firm, from Fayetteville; and the Law Offices of Steven E. Cauley, P.A., from Little Rock. Appellees are the State of Arkansas and the following tobacco manufacturers: Phillip Morris, Inc.; R.J. Reynolds Tobacco Company; Brown and Williamson Tobacco Corporation, individually, and as successor by merger to the American Tobacco Company; and Lorillard Tobacco Company (collectively, the "tobacco companies"). Appellants moved to intervene in the State's tobacco settlement for the purpose of protecting their claimed interest in attorney's fees, pursuant to an alleged contract to represent the State in that matter. Appellants also moved to set aside the consent decree approving the settlement for alleged fraud in obtaining the judgment. The Pulaski County Chancery Court denied both motions. Our jurisdiction of this case is pursuant to Ark. Sup. Ct. R. 1-2(b)(4) and (5), as it raises issues of substantial public interest needing further clarification or development of the law. We affirm.

The record reflects that on May 5, 1997, the State filed suit against the tobacco companies[1] seeking monetary and equitable relief. Throughout 1997 and 1998, numerous orders were entered by the chancery court granting extensions of time for the tobacco companies to file their answers and other responsive pleadings. Eventually, a global settlement was reached between the tobacco companies and fifty-two states and other governmental units, including Arkansas. The terms of the settlement were memorialized in two different documents: (1) a Master Settlement Agreement (MSA), entered between the states and the major cigarette manufacturers, and (2) a Smokeless Tobacco Master Settlement Agreement (STMSA), entered between the states and the smokeless tobacco companies. Arkansas's Attorney General signed the MSA and the STMSA on November 23, 1998. A stay in the proceedings was then granted on November 30, 1998, to give the parties an opportunity to effectuate the settlement. As a result of the numerous extensions of time and the ultimate settlement of the law suit,

---

[1] In addition to the tobacco companies appearing as Appellees herein, the State also filed suit against B. A. T. Industries; Liggett Group, Inc.; Liggett and Myers, Inc.; United States Tobacco Company; Hill and Knowlton, Inc.; the Council for Tobacco Research—U.S.A., Inc.; and the Tobacco Institute, Inc.

no answer was ever filed by any of the tobacco companies, and the parties never conducted any formal discovery. On December 10, 1998, the chancery court entered a consent decree, pursuant to the settlement agreements, that ended the litigation and obligated the tobacco companies to pay the State $1.62 billion over a twenty-year period.

Approximately three weeks later, on December 30, 1998, Appellants filed a motion to intervene in the settled lawsuit between the State and the tobacco companies. Attached to the motion was a notice of attorney's lien for $243 million, an amount equal to fifteen percent of the State's share under the MSA. Appellants asserted that a contract had been negotiated between the State and Milberg-Weiss, wherein Milberg-Weiss would represent the State in the tobacco litigation. Appellants admitted, however, that the contract was never executed.[2] Appellants sought intervention so that they could be listed as designated outside counsel on Exhibit "S" of the MSA. Under the terms of the MSA, those private attorneys designated as outside counsel would be paid reasonable attorney's fees through a pool of money funded by the tobacco companies. Thus, the various states' shares of the settlement would not be diminished by the amount of attorney's fees for private counsel. Conversely, private attorneys not listed on Exhibit "S" would not receive payment from the tobacco companies and would have to seek payment from the states or governmental units that hired them.

Appellants also filed a motion to set aside the December 10, 1998 consent decree pursuant to Ark. R. Civ. P. 60. Appellants claimed that contrary to its terms, the settlement was not in the best interest of Arkansas's citizens. Appellants asserted that because they were not designated as outside counsel in the MSA, any fees dues to them would be payable by the State from its share of the settlement, thus diminishing the benefit to the citizens. Appellants later argued that the consent decree was fraudulently obtained based on alleged misrepresentations made to the chancery court at the time the decree was signed. Much of Appellants' argument regarding fraud stemmed from information contained in a January 1, 1999 article in the *Arkansas Democrat-Gazette* titled "Chancellor cries foul about

---

[2] No similar contracts were negotiated or executed between the State and Appellants Niblock and Cauley; rather, the contract negotiated by Milberg-Weiss provided that any fees to local attorneys were to be paid from any fee received by Milberg-Weiss.

fees." In the article, former Pulaski County Chancellor W.H. "Sonny" Dillahunty reported that it was doubtful that he would have signed the settlement between the State and the tobacco companies had he known that the issue of outside attorney's fees had not been resolved. He stated that when he signed the consent decree, both the State's and the tobacco companies' lawyers had stated that the tobacco companies would pay the private lawyers' fees.

On January 1, 1999, Mackie Pierce replaced Chancellor Dillahunty as Pulaski County Chancellor for the Sixth Division and took over this case. Shortly thereafter, on January 11, 1999, the last day of his tenure in office, Attorney General Winston Bryant filed a motion to amend the consent decree to add the law firm of Milberg–Weiss to Exhibit "S" of the MSA. The tobacco companies objected to any such amendment on the grounds that (1) Appellants lacked standing to set aside the decree, and (2) there was no evidence that Appellants ever did any work in securing the settlement. The tobacco companies pointed to representations made by Bryant in a *Democrat-Gazette* article dated December 31, 1998, wherein Bryant explained that the reason Appellants were not originally designated as outside counsel on the MSA was because the Attorney General's office had done all the work. Bryant stated: "I took the position that if the lawsuit was settled, we didn't need outside counsel, so the contract was never executed." The State eventually withdrew its motion to amend the consent decree on March 29, 1999.

On August 10, 1999, after considerable pleading from all participants, Appellants' motions were heard by the chancery court. The parties stipulated that a valid contract existed between Milberg–Weiss and the State, for the limited purpose of considering Appellants' motions. Notwithstanding, the chancellor denied Appellants' motion to intervene, either by right or permission, and also denied the motion to set aside the consent decree. Additionally, the chancellor found that the State was entitled to the defense of sovereign immunity. Appellants contest each of these three rulings on appeal. They also claim that the chancellor erred in failing to join them as necessary parties to the lawsuit under Ark. R. Civ. P. 19. We do not address this additional argument, as it is clear from the record that is was raised at the last minute and was never ruled on by the chancellor. It is well settled that the failure to obtain a ruling from

the trial court is a procedural bar to our consideration of the issue on appeal. *See Ross Explorations, Inc. v. Freedom Energy, Inc.*, 340 Ark. 74, 8 S.W.3d 511 (2000) (citing *Vanderpool v. Fidelity & Cas. Ins. Co.*, 327 Ark. 407, 939 S.W.2d 280 (1997)); *Howard v. Northwest Arkansas Surgical Clinic, P.A.*, 324 Ark. 375, 921 S.W.2d 596 (1996); *Haase v. Starnes*, 323 Ark. 263, 915 S.W.2d 675 (1996)). We discuss the remaining three issues separately.

## I. Intervention under Rule 24

Appellants argue that the chancellor erred in denying their motion to intervene in the lawsuit between the State and the tobacco companies. Appellants contend that under their contract with the State, they are obligated to seek their fees from the tobacco companies. Thus, Appellants assert that intervention is necessary to protect their rights to attorney's fees under the contract. They also argue that their application for intervention was made in a timely manner, as they claim that they had no cause to intervene until the consent decree was signed and it was revealed that they were not listed on Exhibit "S" of the MSA. Appellants claim further that the parties would not have been prejudiced by the timing of the intervention, because they assert that the State would not have begun receiving payments under the tobacco settlement until December 1999, one year after intervention was sought. We find no merit to these arguments.

■■ The procedure for intervention is set out in Rule 24 of the Arkansas Rules of Civil Procedure, which provides in pertinent part:

(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this state confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) *Permissive Intervention.* Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of

law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

A threshold question in determining whether intervention should be allowed is whether application was made in a timely manner. *Employers Nat'l Ins. Co. v. Grantors*, 313 Ark. 645, 855 S.W.2d 936 (1993). The issue of timeliness is a matter well within the sound discretion of the trial court and is subject to reversal only where that discretion has been abused. *Id.* There are three factors that a trial court must consider in determining timeliness: (1) how far the proceedings have progressed; (2) any prejudice to other parties caused by the delay; and (3) the reason for the delay. *Id.*; *Cupples Farms Partnership v. Forrest City Prod. Credit Ass'n*, 310 Ark. 597, 839 S.W.2d 187 (1992). Using this test, the chancellor found that Appellants' application for intervention was untimely.

██ ██ First, the chancellor found that the proceedings had progressed to and past the entry of a final decree before intervention was sought. The record reflects that the motion to intervene was not filed until approximately three weeks after the consent decree was entered, and the complaint in intervention was not filed until some six months later, on July 27, 1999. There is no question that the entry of the consent decree ended the litigation between the State and the tobacco companies. Thus, the motion to intervene was clearly filed after the proceedings were completed and a final judgment was entered. Arkansas courts have shown a strong reluctance to grant intervention after final judgment. *UHS of Ark., Inc. v. City of Sherwood*, 296 Ark. 97, 752 S.W.2d 36 (1988). *See also Wilson v. Harris*, 227 Ark. 808, 302 S.W.2d 86 (1957) (holding that, generally, once litigation has progressed to final judgment, it is too late for third persons to intervene). Postjudgment intervention is generally allowed only upon a strong showing of entitlement by the applicant or a demonstration of unusual and compelling circumstances. *Id.* As will be seen below, the evidence here falls short of

establishing a strong showing of entitlement or compelling circumstances.

■ As for the second timeliness factor, the chancellor found that the parties to the suit, the State and the tobacco companies, would be prejudiced by the delay caused by intervention. Specifically, the chancellor found that under the terms of the MSA, "State-Specific Finality" cannot occur as long as litigation is ongoing in the matter. Section XI(f)(3) of the MSA provides that "[n]o amounts may be transferred or credited to a State-Specific Account for the benefit of any State as to which State-Specific Finality has not occurred[.]" "State-Specific Finality" occurs when (1) the MSA and the resulting consent decree have been approved and entered by the chancery court as to all original participating manufacturers or, in the event of an appeal, by the court hearing such appeal; (2) the court has entered an order dismissing with prejudice all claims against the released parties; and (3) the time for appeal or review of these orders has expired, or, in the event of an appeal, the orders have been affirmed in all material respects by the court of last resort and are no longer subject to further appeal. All three factors must occur to achieve State-Specific Finality. In the present case, the delay that would have resulted from allowing Appellants to intervene would have prejudiced the State by postponing its achievement of State-Specific Finality and, in turn, its receipt of settlement payments.

■ Additionally, there is potential prejudice to the remaining fifty-one states and governmental units that signed the settlement. The MSA provides that no settling states or governmental units will begin receiving payments until the occurrence of "Final Approval." "Final Approval," as defined in the MSA, means the earlier of (1) the date on which State-Specific Finality has occurred in a sufficient number of the settling states, or (2) June 30, 2000. As used in that definition, "State-Specific Finality in a sufficient number of Settling States" means that State-Specific Finality has occurred in at least eighty percent of the total number of settling states having aggregate allocable shares of the settlement equal to at least eighty percent of the total aggregate allocable shares assigned to all settling states. Thus, to a large degree, receipt of payment by any one settling state is dependent upon the achievement of State-Specific Finality in the other settling states.

For the third factor in determining timeliness, the chancellor found that there was no sound or compelling reason for the delay in seeking intervention. The chancellor was unpersuaded by Appellants' argument that any delay was due to the State's refusal to keep them informed of the date when the consent decree was to be signed. The chancellor based this conclusion on his review of the correspondence between Appellants and the Attorney General's office, dated from September 16, 1998, to December 8, 1998. The letters clearly demonstrate Appellants' desire to have Milberg-Weiss placed on Exhibit "S," as opposed to having to pursue a claim for fees against the State. The letters also reveal Appellants' awareness that they had not been included on Exhibit "S," and that the time for signing the MSA and entering the consent decree was rapidly approaching or had possibly passed.

For example, a letter dated November 17, 1998, from Appellant Cauley to Winston Bryant contains a statement by Cauley that he had reviewed the MSA and was aware that the agreement was to be signed that week. Indeed, the MSA reflects that the date for agreeing to the settlement was November 23, 1998. Similarly, a letter from Cauley to Assistant Attorney General Timothy Gauger, dated December 8, 1998, reflects in part: "When do you anticipate seeking the state's consent decree, *or have you done so already?*" (Emphasis added.) The chancellor found that this statement was indicative of Cauley's knowledge that Milberg-Weiss had not been listed on Exhibit "S," and that the possibility existed that the consent decree may have already been entered. Collectively, these two letters show that, as of December 8, 1998, Appellants were aware that the MSA had already been signed and that the implementing consent decree may have already been entered. Yet despite this knowledge, no intervention was sought until some three weeks after the decree was actually entered. The chancellor found that had Appellants desired to protect their interest by intervening in the case, the proper time to do so was prior to December 10, 1998. Such timely intervention was not sought, the chancellor found, not because Appellants were kept in the dark about the progression of the settlement, but because Appellants did not wish to appear adversarial to their alleged client.[3]

---

[3] Interestingly, in the January 1, 1999 *Democrat-Gazette* article, which was attached as an exhibit to one of Appellants' motions, it is reported that, regarding the lack of notification by the State, "Cauley conceded they should have called the judge's office or the

■ Given all the facts and circumstances of this case, we cannot say that the chancellor abused his discretion in finding that the motion to intervene was untimely. Appellants simply have not shown unusual or compelling circumstances that prevented them from seeking intervention prior to the time that final judgment was entered. Moreover, Appellants have failed to show that the parties to the tobacco suit would not have been prejudiced by the delay caused by intervention.

■ ■ In any event, regardless of the untimely application, Appellants were not entitled to intervene as a matter of right, pursuant to Rule 24(a). There are three requirements that must be met to intervene as a matter of right: (1) a recognized interest in the subject matter of the primary litigation; (2) an interest that might be impaired by the disposition of the suit; and (3) an interest not adequately represented by the existing parties. *Matson, Inc. v. Lamb & Assocs. Packaging, Inc.*, 328 Ark. 705, 947 S.W.2d 324 (1997); *Pearson v. First Nat'l Bank*, 325 Ark. 127, 924 S.W.2d 460 (1996). When these three requirements are met and timely application is made, intervention of right should be granted. If, however, a party seeking intervention will be left with the right to pursue an independent remedy against the parties in the primary proceeding, regardless of the outcome of the pending case, then the party has no interest that needs protecting by intervention of right. *Id.*; *Billabong Products, Inc. v. Orange City Bank*, 278 Ark. 206, 644 S.W.2d 594 (1983).

Here, the chancellor found that none of the requirements for intervention of right were met. Specifically, the chancellor found that Appellants had no recognized interest in the subject matter of the litigation between the State and the tobacco companies. The chancellor reasoned that what Appellants sought, payment of attorney's fees under a contract with the State, was nothing more than a "classic attorney-client fee dispute." Conversely, the chancellor characterized the underlying litigation as a suit seeking damages and injunctive relief on behalf of Arkansas's citizens against the tobacco companies for health problems stemming from the use of tobacco products. Secondly, although the chancellor agreed with Appellants that their interests in collecting attorney's fees were not ade-

clerk's office."

quately represented by either party to the litigation, he found that such interests were not the property or transaction that was the subject of the suit.

 Lastly, and perhaps most significantly, the chancellor found that Appellants' interest in obtaining attorney's fees would not be impaired by the disposition of the litigation between the State and the tobacco companies. This finding was based on Appellants' ability to pursue an independent remedy against the State for attorney's fees, based on the proceeds awarded to the State under the settlement. Assuming that Appellant had a valid contract with the Attorney General to represent the State in the tobacco litigation, and the State failed to pay under the terms of that contract, Appellants would have the right to bring the alleged breach-of-contract claim before the Arkansas State Claims Commission. The State Claims Commission has exclusive jurisdiction over payment of all just and legal debts of the State. *See Fireman's Ins. Co. v. Arkansas State Claims Comm'n*, 301 Ark. 451, 784 S.W.2d 771, *cert. denied*, 498 U.S. 824 (1990); Ark. Code Ann. § 19-10-204 (Repl. 1998). Thus, because Appellants have the right to pursue their claim elsewhere, they have no right to intervene in this matter. *See Billabong Products, Inc.*, 278 Ark. 206, 644 S.W.2d 594.

 Likewise, Appellants do not qualify for permissive intervention under Rule 24(b), which provides for permissive intervention (1) where a state statute confers a conditional right to intervene, or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. Permissive intervention is discretionary, depending upon whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. Rule 24(b); *Billabong Products, Inc.*, 278 Ark. 206, 644 S.W.2d 594. This court will not reverse the trial court's decision unless there has been an abuse of discretion. *Id.* Here, Appellants have cited no state statute that confers upon them a conditional right to intervene, nor have they shown that their claim for attorney's fees and the underlying litigation have a common question of law or fact. As stated above, Appellants' claim is merely one for attorney's fees for allegedly representing one of the parties to the suit. It has nothing in common with the substantive claims asserted in the underlying suit. Accordingly, we cannot say that the chancellor abused his discretion in denying permissive intervention.

In sum, Appellants failed to show that intervention was warranted either by right or permission. The motion to intervene was not filed until after the underlying litigation had been settled and a final decree entered. Appellants failed to demonstrate that their application for intervention was timely under the three criteria set out by this court. Appellants further failed to show that they were entitled to intervene, as it was undisputed that Appellants had an independent remedy against the State for any alleged fees that were owed. Appellants also failed to demonstrate that permissive intervention was available, given the chancellor's finding that Appellants' claim had no question of law or fact in common with the litigation between the State and the tobacco companies. Accordingly, we affirm on this issue.

## II. Setting Aside Consent Decree under Rule 60

Appellants next argue that the chancellor erred in refusing to set aside the consent decree on the ground that it was procured by fraud. The chancellor found that Appellants lacked standing to challenge the terms of the consent decree. Particularly, the chancellor found that Appellants (1) were not parties to the settlement and were not permitted to intervene in the matter; (2) were not attorneys of record in the tobacco litigation; (3) had never appeared before the chancery court representing the State or communicated with the court on behalf of the State; and (4) had never communicated with any attorneys for the tobacco companies in the litigation. As such, the chancellor concluded that Appellants were not bound by the terms of the consent decree and thus had no standing to set aside the decree. We agree.

It is a well-recognized general rule that strangers to the record have no standing on which to base an application to vacate a judgment, unless so authorized by statute. *Weill v. Weill*, 226 Ark. 206, 288 S.W.2d 946 (1956). *See also* 47 AM. JUR. 2D *Judgments* § 757 (1995). Thus, one not a party or privy to the action, or who is not bound by the judgment or prejudiced by it, may not apply to set aside the judgment. *Id*; *Restatement (Second) of the Law of Judgments* § 64 (1982). The *Restatement* further provides: "An attorney for a party is generally regarded as lacking standing to set aside a judgment for or against his client *even though the attorney's compensation may be dependent on the amount or terms of the judgment.*"

*Id.* at cmt. d (emphasis added). This principle finds support in our decisions regarding an attorney's ability to effect the terms of a client's settlement.

It is settled law that an attorney cannot compel his or her client to continue litigation; the client may dismiss or settle the cause of action without consulting the attorney. *Cato v. Ark. Mun. League Mun. Health Benefit Fund*, 285 Ark. 419, 688 S.W.2d 720 (1985); *Jarboe v. Hicks*, 281 Ark. 21, 660 S.W.2d 930 (1983); *Martin v. Pope*, 226 Ark. 522, 290 S.W.2d 849 (1956) (*per curiam*). "Of course, in ordinary litigation such settlement would be subject to the contractual rights of the attorney *in the proceeds of the settlement.*" *Id.* at 523, 290 S.W.2d at 849 (emphasis added). In other words, an attorney retained by contract for a contingent fee may have a right to collect his fee from the proceeds of the settlement; however, he would not have a right to dictate the terms of the settlement or the amount. Yet, that is precisely what Appellants are attempting to do.

Appellants concede that only their alleged client, the State, through its Attorney General, is empowered to designate private outside counsel under the MSA. The Attorney General, for whatever reason, never saw fit to do so prior to the entry of the consent decree. Appellants have not provided us with any citation of authority, and we are aware of none, that would permit them to challenge their client's decision to agree to particular terms of a settlement merely to protect their interest in collecting a higher fee. *See Nash v. Estate of Swaffar*, 336 Ark. 235, 983 S.W.2d 942 (1999). Thus, we agree with the chancellor that because their alleged client chose to settle the suit without designating any attorneys on Exhibit "S," Appellants' only available remedy is to attempt to secure its fees from the proceeds of the State's settlement.

Moreover, we agree with the chancellor that once the decree was entered, the Attorney General no longer had the option of amending Exhibit "S" without the agreement of the participating tobacco manufacturers and the remaining settling states. The MSA provides that the agreement may not be amended or modified except by written instrument executed by the participating tobacco manufacturers that would be affected by such amendment and by all the settling states affected by the amendment. The amendment or modification proposed here would affect all those states and governmental units who had already designated outside counsel to receive

fees from the pool of money provided by the participating tobacco manufacturers, in that the designation of any additional counsel would necessarily dilute the amounts received by those attorneys already designated as outside counsel. The MSA provided for a limit or cap on the amount of monies that would be expended each year by the participating manufacturers for the payment of all outside attorney's fees, no matter how many attorneys were due to receive awards. Thus, the number of attorneys attempting to collect such fees would necessarily affect the amount of fees received by the individual attorneys. This, in turn, would affect the amount payable by the settling states under their respective contracts with outside counsel.

Section 5 of Exhibit "O" of the MSA provides that the rights and obligations of the parties to a contract between a settling state and outside counsel shall not be affected except (1) insofar as outside counsel grants the state a release, and (2) to the extent that any fee awarded under the MSA will be credited dollar-for-dollar against any amount due under the contract. In other words, unless a proper release is executed relieving the settling state of any obligation to pay the contract fees or unless outside counsel receives complete compensation from the tobacco companies' fund, the contracting state may be responsible for making up the difference in payment. Thus, a reduction in the amount paid to outside counsel, *i.e.*, from the addition of more attorneys eligible to seek fees from the tobacco companies, could correspondingly result in an increase in the amount a settling state would have to pay to satisfy its contract with said outside counsel.

■ We further agree that under this court's case law, the chancellor was without authority to unilaterally modify or amend the consent decree. The chancellor correctly relied on this court's holding that "[a]bsent a showing of fraud *in the inducement of the original agreement*, or *unless both parties presently consent*, the court is *powerless* to modify that portion of the decree based on the contract settlement between the parties." *Anding v. Anders*, 249 Ark. 413, 414–15, 459 S.W.2d 416, 417 (1970) (citations omitted) (emphasis added). *See also Murdock v. Slater*, 326 Ark. 1067, 935 S.W.2d 540 (1996); *Selig v. Barnett*, 233 Ark. 900, 350 S.W.2d 176 (1961) (holding that a consent judgment is a judgment not reached by the court, but agreed to by the parties and merely recorded with the sanction of the court). There is no evidence here that fraud was

committed by one party to induce the other party to settle the case. Nor is there evidence that both parties presently consent to Appellants' proposed modification. To the contrary, the State and the tobacco companies are satisfied with the original terms of the agreement.

Accordingly, we affirm the chancellor's refusal to set aside the consent decree for lack of standing. Appellants are not parties or privies to the suit between the State and the tobacco companies, and they have no standing to attempt to set aside the consent decree, for fraud or any other reason. Appellants are not bound by the consent decree, nor are their rights to attorney's fees impaired or affected by the terms of the consent decree. Assuming *arguendo* that Appellants represented the State in any phase of the tobacco litigation and that their fees were dependent upon the outcome of the suit, they still have no standing to set aside the consent decree against their client's wishes. Appellants are powerless to challenge their alleged client's settlement of the case. Furthermore, the chancellor has no more authority to modify the terms of the settlement agreed to by the litigants, than Appellants have authority to force their client to settle on their terms.

### III. Sovereign Immunity

For the final point for reversal, Appellants argue that the chancellor erred in ruling that the State was immune from Appellants' claims in the chancery court. Sovereign immunity is jurisdictional immunity from suit. *State Office of Child Support Enforcem't v. Mitchell*, 330 Ark 338, 954 S.W.2d 907 (1997). This defense arises from Article 5, § 20, of the Arkansas Constitution, which provides: "The State of Arkansas shall never be made a defendant in any of her courts." This court has consistently interpreted this constitutional provision as a general prohibition against awards of money damages in lawsuits against the state and its institutions. *See, e.g., Cross v. Arkansas Livestock & Poultry Comm'n*, 328 Ark. 255, 943 S.W.2d 230 (1997); *Fireman's Ins. Co.*, 301 Ark. 451, 784 S.W.2d 771. The doctrine of sovereign immunity is rigid and may only be waived in limited circumstances. *Mitchell*, 330 Ark 338, 954 S.W.2d 907. This court has recognized only two ways in which a claim of sovereign immunity may be surmounted: (1) where the state is the moving party seeking specific relief; and (2) where an act

of the legislature has created a specific waiver of immunity. *Id.* In reviewing the sovereign-immunity issue, we first determine whether Appellants have made a claim against the State.

Appellants assert that their claim is not one against the State, because they seek payment only from the tobacco companies, under the fund created by the MSA. However, given the chancellor's denial of intervention and our affirmance of that ruling, Appellants' claim for attorney's fees is now a claim against the State, either pursuant to an attorney's lien or under a claim of breach of contract. Either way, it is obvious that the claim is one against the State that will necessarily require payment from State funds.

The question, then, is whether the State has waived its sovereign immunity in this matter. This court has consistently recognized that the only exception to sovereign immunity, other than where the legislature has specifically waived such immunity, occurs when the State is the moving party seeking specific relief. *Mitchell*, 330 Ark. 338, 954 S.W.2d 907; *Fireman's Ins. Co.*, 301 Ark. 451, 784 S.W.2d 771. Even then, however, the defense is only waived as to any counterclaim or offset. *Id.* Because Appellants are not parties to the suit or intervenors, this exception is not applicable. We are not persuaded by Appellants' reliance on *Arkansas State Highway Comm'n v. Roberts*, 248 Ark. 1005, 455 S.W.2d 125 (1970), in support of their argument that when the state is a suitor in state court, it subjects itself to the claims of nonparties. There, the state had obtained some land, via its power of eminent domain, and was attempting to use the shield of sovereign immunity to defeat the claim of two intervenors who asserted an interest in the land as remaindermen. The distinction between that case and the one at hand is that the nonparties claiming against the state were in fact intervenors. Moreover, this court held that because the intervenors had an interest in land that was being taken under eminent domain, they were necessary parties to the state's action.

Appellants also contend that the State waived its immunity when it moved to amend the consent decree to include Appellants on the list of designated outside counsel provided for in the MSA. Appellants rely on our recent holding in *Lake View School Dist. No. 25 v. Huckabee*, 340 Ark. 481, 10 S.W.3d 892 (2000). That case involved a class-action lawsuit against the state for inequities in the public school funding system. By way of legislation, the state

subsequently attempted to solve those inequities. The result was the creation of a fund of $130 million. The attorneys for the school district sought attorney's fees on the ground that the work they had done not only benefited the Lake View school district, but had actually benefited every school district in the state. In a proposed agreed order, counsel for all parties, including the Attorney General's office, agreed that the chancery court should make a determination of reasonable attorney's fees and costs to be paid to counsel for the school district. Although the chancery court rejected the agreed order, it later announced the figure of $7 million as proposed attorney's fees for the purpose of notifying the class members of a settlement. The chancery court ultimately denied recovery of attorney's fees based, in part, on the state's subsequent claim of sovereign immunity. This court reversed the chancellor's finding:

> We conclude that when the State of Arkansas signed off in two published notices to the class members advocating that attorneys' fees be paid and continued to push for payment of attorneys' fees even after the chancery court refused to sign the Agreed Order, it waived its sovereign–immunity defense to payment of those fees. We do understand that the State was seeking resolution of this litigation by supporting payment of those fees, but we are hard pressed to reconcile published notices to class members supporting fees and representations to the chancery court to the same effect with a later claim of immunity.

*Id.* at 496, 10 S.W.3d at 901 (citations omitted).

Appellants argue that the actions of the Attorney General in this case are very similar to those in *Lake View*. Specifically, Appellants rely on the Attorney General's motion to amend the consent decree, filed on January 11, 1999. In that motion, the Attorney General asked the chancery court to add Appellants to the list of designated outside counsel in Exhibit "S" of the MSA. The proposed amendment reflected inpart:

> Although no final contract was executed and the case was not tried, Milberg Weiss performed certain legal services and incurred certain expenses in anticipation .of the contract and the litigation. The work performed by Milberg Weiss would undoubtedly have benefited the State's case had the litigation not been resolved by settlement.

Appellants argue that under *Lake View*, this motion and proposed amendment amounted to a waiver of sovereign immunity. We disagree.

The state's actions in *Lake View* are distinguishable, in that, there, the state not only advocated the payment of attorney's fees in general, it advocated that the fees be paid from state funds. Here, however, the State advocated only that Appellants be paid attorney's fees from the tobacco companies. The State's motion to amend reflects that it had obtained releases from Appellants that they "have agreed to seek fees and costs only from the tobacco industry and the smokeless tobacco industry and to waive and release any and all claims against the State." The motion reflects further: "This amendment to the Consent Decree will mean that these attorneys will have no claim on Arkansas' share of the historic settlement with the tobacco and smokeless tobacco industry and will look only to the industry for fees and costs." Additionally, unlike the situation in *Lake View*, the State did not continue to push for attorney's fees on behalf of Appellants. To the contrary, the State withdrew its motion before any action had been taken by the chancery court. It is thus clear that the State never waived its immunity from a claim for attorney's fees to be collected from State coffers. Accordingly, our decision in *Lake View* does not require a reversal of the chancellor's finding that the State was entitled to the defense of sovereign immunity.

We further reject Appellants' argument that the State waived its immunity by the alleged actions done in bad faith by various persons in the Attorney General's office. This argument is based on the alleged fraud committed by the State's attorneys by informing Chancellor Dillahunty that there would be no claims for fees from private attorneys. The cases that Appellants rely upon pertain to situations in which (1) state officers or agents are sued individually for actions done *ultra vires* or in bad faith, or (2) only injunctive relief is sought. Those cases are obviously inapplicable to the circumstances here.

We thus affirm the chancellor's ruling that the State is entitled to sovereign immunity from Appellants' claim for attorney's fees brought in state court. There is no convincing evidence that the State waived its immunity merely by filing its tobacco suit in state court. Under this court's cases, the State's immunity would only be considered waived as to any counterclaims or offsets.

Because Appellants are not parties to the State's suit and were not permitted to intervene in the action, the State is immune from their claims in state court. Furthermore, the State did not waive its immunity when it temporarily advocated that Appellants be listed on Exhibit "S" so that they could be paid fees by the tobacco manufacturers. Accordingly, the State is immune from Appellants' claim for fees in state court. This is not to say, however, that Appellants are precluded from seeking payment of their fees from the State in the proper forum, *i.e.*, the Arkansas State Claims Commission.

Affirmed.

BROWN, IMBER, and SMITH, JJ.,concur.

ROBERT L. BROWN, Justice, concurring. I agree with the result reached in this case. However, on the issues of intervention, I would affirm solely for the reason that the law firms did not have a recognized interest in the subject matter of the primary litigation and settlement. That, of course, is one of the criteria for intervention as a matter of right. *Matson, Inc. v. Lamb & Assocs. Packaging, Inc.*, 328 Ark. 705, 947 S.W.2d 324 (1997). Accordingly, I would not reach the issue of timeliness of the intervention and consider that discussion in the opinion to be *obiter dictum*.

SMITH, J., joins.

ANNABELLE CLINTON IMBER, Justice, concurring. I fully agree with the opinion of the majority in this matter. I write separately only to emphasize one issue not fully addressed by the majority opinion.

Appellants premised their motion to intervene in the settlement agreement between the State and the tobacco companies upon what they alleged to be a contractual right to seek fees directly from the tobacco companies. This contractual right, they argue, stems from paragraph 3.D. of the contingency fee contract negotiated between Appellants and the State, which provides:

> In order to reduce the amount of attorneys' fees due Milberg Weiss, Milberg, Weiss will seek to recover the State's attorneys' fees and costs to [sic] the defendants pursuant to any applicable fee shifting statutes or legal doctrines in the event the State prevails in litigation. If the State successfully receives such an award of fees

and costs from the defendants, any amount awarded shall be deducted from any fees and costs otherwise due Milberg, Weiss pursuant to the contingent fee provisions of this Contract.

Appellants' reliance upon this provision is misplaced. Assuming for our purposes that the contract is valid, it does not bestow a right upon the Appellants. Rather, it creates an obligation. Appellants have a duty, not a right, under the contract to seek fees from the tobacco companies. The State, to whom the benefit of this obligation would flow, appears to have waived this obligation and relieved Appellants of their duty to seek fees directly from the tobacco companies by choosing not to designate Appellants as outside counsel on Exhibit S to the Master Settlement Agreement. Appellants may disagree with the State's decision regarding this matter, but no right exists that is subject to impairment by the denial of intervention.