2012 Ark. App. 352

**Jimmy MANN, Appellant**

**v.**

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 12–12.**

Court of Appeals of Arkansas.

May 16, 2012.

Richard F. Rhodes, Osceola, for Appellant.

Tabitha Baertels McNulty, Little Rock, for Appellee.

CLIFF HOOFMAN, Judge.

Appellant Jimmy Mann appeals from the order of the Mississippi County Circuit Court denying his petition to intervene in the dependency-neglect case involving his great-niece and great-nephew, A.D. and J.N., subsequent to the termination of the parental rights of the children's parents. Mann argues on appeal that the trial court abused its discretion in denying his petition. We find no abuse of discretion and affirm.

This case began on February 11, 2010, when the Arkansas Department of Human Services (DHS) placed an emergency hold on five-year-old A.D. and four-year-old J.N., along with their half-brother, R.N., after R.N. was born with amphetamines in his system.[1] The affidavit attached to the emergency petition stated that the children's mother, Amber, also tested positive for amphetamines and that the family had been living with the children's maternal grandmother, Teresa Doss, who is Mann's sister, as well as the children's stepgrandfather, Everette Doss, and two of the Dosses' other children. When the children were removed, neither child was enrolled in school, J.N. was still wearing diapers, and A.D. still used a pacifier. The children were also so infested with head lice that A.D. had sores on her head and J.N. had to have his head shaved. According to the affidavit, the decision was made not to leave the children in the home after discovering that Doss had previously tested positive for amphetamines during a prior investigation in September 2009; that Doss had been charged with endangering the welfare of a minor in January 2010, when her seventeen-year-old son violated curfew; that there were two prior reports of neglect on the family that were either inactive or unsubstantiated; and that there were two prior true reports of sexual abuse of Amber by her stepuncle and putative father of A.D. and J.N., Michael Doss, while he lived in the home. Due to these allegations involving physical abuse and inadequate supervision, the affidavit stated that the children's health and safety were in danger and that they should remain in the custody of DHS.

The parents stipulated to a finding that the children were dependent-neglected in an order entered on March 25, 2010. The initial goal of the case was reunification with Amber, and visitation with the children was provided to both Amber and the Dosses. At the June 2010 review hearing, the trial court noted that an allegation had arisen by J.N. that he had been sexually abused by his uncle James while living in the Dosses' home. Results of a home study on the children's great-grandparents, Bonnie and William Mann, was also entered into evidence, but DHS recommended that the placement be denied because the worker could not verify who exactly resided in the home. There was also evidence that Amber and the Dosses had all failed drug tests administered prior to a recent visitation.

DHS filed a motion to terminate reunification services on June 8, 2010. This motion was granted by an order entered on September 15, 2010, after the trial court found that the children had been subjected to aggravated circumstances by Amber. The court also changed the goal of the case to adoption at that time, with a concurrent goal of permanent custody apparently re-

---

1. Mann's petition to intervene, as well as this appeal, concern only two of the juveniles, A.D. and J.N.

lated to R.N. On November 24, 2010, an order terminating parental rights was entered, and DHS was authorized to consent to adoption. Bonnie Mann continued to attend visitations with the children following the termination order until they were stopped in May 2011.

On June 2, 2011, appellant Jimmy Mann filed a petition to intervene, alleging that he was A.D.'s and J.N.'s great-uncle and that he desired to adopt them. Petitions for adoption and for appointment of guardian were also filed by Mann. The trial court ordered an adoptive home study on Mann, and both CASA and DHS prepared reports for the September 2011 hearing on the petition to intervene. According to the CASA home study, although there were a couple of potential safety issues in the home, the primary concern was Mann's statement that he did not see anything wrong with the environment the children were in prior to removal. Mann also stated that he had never raised any children but that he had spent a lot of time with A.D. and J.N. at his sister's home when they lived there. He acknowledged that the children had never been to his home. The home study stated that, during an interview, the children indicated that they did not want to live with Mann. The CASA report concluded that custody should not be given to Mann, due to the concern that this would place the children back into the same environment with the extended family from whom they were originally removed.

The DHS home study on Mann stated that he had decided to pursue placement of A.D. and J.N. once it was determined that they were not going to be able to return to their mother in 2010. Mann lived alone in a three-bedroom home and had already prepared rooms for the children. He indicated that he would seek assistance from his family to care for the children if neces-sary. The home study concluded that Mann had a stable home and employment and that he could provide a good home environment for the children. Although the DHS study noted that he would not be approved as a regular foster parent due to his home's layout, Mann was approved for the placement of these particular children as his relatives.

Mann testified at the hearing that he owned his own home and that he was financially able to care for the children. He also stated that it was important that the children grow up around their family members who lived nearby. When asked why he had not had a home study completed prior to that time, Mann claimed that he had asked for one on several occasions but that the paperwork had been misplaced by DHS and the adoption agency. According to Mann, it was not until he retained an attorney that he finally obtained a home study. Mann stated that he had spent time with the children in the past at his sister's home but that he did not notice the head lice or other issues. He denied that the children would be in the same environment if they were placed with him, although he admitted that he would ask for help from his sister and other family members if needed. He stated that his sister, Teresa, lived only a couple of miles away. Teresa also testified and stated that DHS had been uncooperative in performing home studies on her family and in allowing visitation. She agreed that she would help her brother with the children if he asked.

Dorothy Erby, the CASA volunteer, testified that the children were currently in separate foster homes because J.N. had some recent behavioral problems that were too much for his previous foster parents. Erby stated that J.N. was now doing very well, although he missed his sister, whom he saw each day at school. Although Erby

could not remember the last date of visitation between the children and Mann, she indicated that it had "been a while." She testified that she did not recommend that Mann be considered for adoption because of his lack of concern about the children's previous home environment. She noted that the sexual-abuse allegation by J.N. had been found true, and she was worried that Mann would not protect them from that environment in the future, especially considering his testimony that he would be willing to seek assistance from his family. Although Erby testified that the current foster parents had both expressed interest in adopting one of the children, she recommended that the children be placed together.

Amanda Clark, the adoption specialist assigned to the case, testified that she also wanted the children to be adopted together and that she had identified a possible home. She indicated that visits had not yet been arranged with the possible adoptive home, however, due to the current intervention proceedings, stating that it would be contrary to the children's mental health to start the visits and then have to discontinue them. Clark stated that visitations with the children's extended family had been ended at the recommendation of their therapist. Although she testified that relative placement was generally preferable for children, she stated that DHS had concerns about Mann's home because he would need family support and the children could end up back in the same environment with their grandmother.

At the conclusion of the hearing, the trial court stated that it understood the relationships that existed with the extended family involved in the case, as well as the love for one's grandchild. The court further understood how a lay person could become frustrated with a governmental agency such as DHS without the assistance of an attorney. However, the court found that the petition for intervention should be denied because it was untimely and, after noting that it was permissive intervention being sought, because Mann had not had any recent contact or visitation with the children. An order to this effect was entered on September 28, 2011, and Mann appealed from the order.[2]

Mann argues on appeal that the trial court abused its discretion in denying his petition to intervene in this dependency-neglect proceeding. He concedes on appeal that intervention of right is not applicable here and that his request was one for permissive intervention under Ark. R. Civ. P. 24(b) (2011). Under Rule 24(b), which governs permissive intervention, "[u]pon timely application anyone may be permitted to intervene in an action: (1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." In exercising its discretion under this rule, "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Ark. R. Civ. P. 24(b). A trial court's decision on whether to grant permissive intervention will only be reversed if there is an abuse of discretion. *Schubert v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 113, 2010 WL 374183. An abuse of discretion is defined as "discretion improvidently exercised, i.e.,

---

**2.** Mann's notice of appeal on October 21, 2011, was neither timely filed nor signed by him as required by Ark. Sup.Ct. R. 6–9(b)(1) (2011), and a motion to dismiss the appeal was filed by DHS. Our supreme court treated Mann's response as a motion for belated appeal, which was then granted, and the motion to dismiss was denied. *Mann v. Ark. Dep't of Human Servs.*, 2012 Ark. 96, 2012 WL 664278.

exercised thoughtlessly and without due consideration." *Delgado v. Delgado*, 2012 Ark. App. 100, at 6, 389 S.W.3d 52, 57.

■ The threshold issue that must first be addressed is whether the motion to intervene was timely. *Kelly v. Estate of Edwards*, 2009 Ark. 78, 312 S.W.3d 316. The timeliness of the petition is to be determined from all of the circumstances, and there are three factors to be considered: (1) how far the proceedings have progressed; (2) any prejudice to other parties caused by the delay; and (3) the reason for the delay. *Id.; Lowell v. Lowell*, 55 Ark.App. 211, 934 S.W.2d 540 (1996). There is a strong reluctance by Arkansas courts to grant intervention after final judgment has already been entered, and postjudgment intervention is generally allowed only upon a strong showing of entitlement by the petitioner or a demonstration of unusual or compelling circumstances. *Milberg, Weiss, Bershad, Hynes, and Lerach, LLP v. State*, 342 Ark. 303, 28 S.W.3d 842 (2000).

Here, in finding that the petition was not timely, the trial court noted that Mann's petition for intervention was not filed until June 2011, fifteen months after the children were removed from the home in February 2010, and approximately seven months after parental rights were terminated. Mann asserts that the proceedings had not progressed so far as to render his petition untimely and argues that the goal of the case was not changed to adoption until September 2011, three months after he filed his petition to intervene. However, as DHS asserts, this is incorrect; the trial court actually changed the goal of the case to adoption as to A.D. and J.N. on August 17, 2010, in the permanency-planning and no-reunification order, which was approximately ten months prior to Mann's petition to intervene.

Mann also argues that neither DHS nor the children would suffer prejudice if he were allowed to intervene at this late date and present his petition for adoption. To the contrary, as both DHS and the attorney ad litem assert, the adoption specialist testified that she had identified a potential family willing to adopt both children but that visits with the family had not yet been allowed due to the pendency of these proceedings and the possibility of emotional harm to the children. Thus, the children are currently still in their foster homes. Another relevant issue in this determination is the trial court's finding that Mann had not had any recent contact or visits with the children. There was no evidence presented that he had even seen the children since they were placed in foster care, other than the CASA worker's testimony that it "had been a while." In fact, visitation with other members of Mann's family had been suspended upon the advice of the children's therapist. Further, there was testimony that the children had expressed their desire not to live with Mann, and both CASA and DHS were concerned about the children being placed back into the same harmful environment if they were adopted by Mann. Thus, there would be potential prejudice to DHS and the children if, at this late hour, Mann were allowed to intervene in the case and present his petitions for adoption and for appointment of guardian. As the attorney ad litem asserts, any delay in permanency for these children is prejudicial.

On the third factor relevant to timeliness, which is the reason for the delay in filing the petition to intervene, Mann blames DHS for its alleged failure to complete a home study on him despite his repeated requests for one. However, as DHS contends, there is no correlation between the completion of a home study and his filing of a petition to intervene. In fact, the home studies that were completed

on Mann in July 2011 were ordered by the trial court only after he had filed his petition. Thus, there is no merit to his argument that the delay in obtaining the home study was the cause for his delay in attempting to intervene. Mann also testified that he was aware that the children had been placed in foster care but that he waited to file his petition until after Amber's parental rights were terminated. Our supreme court has affirmed the trial court's denial of an untimely petition to intervene in such cases, holding that petitioners may not sit on their rights and wait until they are not satisfied with the way the case is progressing before deciding to intervene. *Ballard v. Garrett,* 349 Ark. 371, 78 S.W.3d 73 (2002); *Employers Nat'l Ins. Co. v. Grantors to the Diaz Refinery PRP Comm. Site Trust,* 313 Ark. 645, 855 S.W.2d 936 (1993). Moreover, because Mann filed his petition to intervene after Amber's parental rights had been terminated, he was then a legal stranger to the children and had no rights deriving from his former relationship as their great uncle. *See Burt v. Ark. Dep't of Health & Human Servs.,* 99 Ark.App. 402, 406, 261 S.W.3d 468, 471 (2007) (distinguishing a relative's rights post-adoption from those deriving from the parent's rights before those rights are terminated). Therefore, the trial court did not abuse its discretion in denying Mann's petition on the basis that it was untimely.

Because Mann failed to meet the threshold requirement that his petition to intervene must be timely, it is not necessary to address his second argument challenging the trial court's other basis for denying his petition, which was that he had no recent contact or visitation with the children. *Kelly v. Estate of Edwards, supra.* However, we note that the evidence supports the trial court's decision to deny Mann's permissive intervention on this basis as well. Mann failed to offer any affirmative proof that he had contacted the children or had attempted contact with them, whether by letter, phone call, or in-person visits. He admitted that the children had never been to his home and merely claimed that he had spent time with them at his sister's home, where he apparently failed to notice the children's developmental delays, such as not being toilet trained, not being in school, and still using a pacifier, in addition to the children's severe head-lice infestation. Thus, there was no abuse of discretion by the trial court in denying Mann's petition to intervene.

Affirmed.

ROBBINS and MARTIN, JJ., agree.