ROSS EXPLORATIONS, INC. *v.*
FREEDOM ENERGY, INC.

98-1415 8 S.W.3d 511

Supreme Court of Arkansas
Opinion delivered January 13, 2000
[Petition for rehearing denied February 17, 2000.]

*Pryor, Barry, Smith, Karber & Alford, PLC*, by: *Gregory G. Smith*, for appellant.

*Daily & Woods, P.L.L.C.*, by: *Thomas A. Daily* and *Leigh M. Chiles*, for appellee.

LAVENSKI R. SMITH, Justice. Appellant, Ross Explorations, Inc. ("Ross"), seeks reversal of a declaratory judgment obtained by Appellee, Freedom Energy, Inc. ("Freedom"). Following a hearing, the Sebastian County Chancery Court declared that Freedom possessed the lease rights to natural gas produced from the Dill "A" #1 gas well. The trial court found that the Ross leases expired due to the well failing to produce gas in commercial paying quantities. The court further found that later leases which Freedom acquired from the lessors entitled Freedom to the gas subsequently produced after the termination. Ross alleges that the trial court committed three errors. First, Ross contends that the trial court erred in finding that the well's lifting costs exceeded its revenue. Second, Ross contends that the trial court erred in its choice of the time period for determining if production was adequate. Third, Ross, contends that the trial court erred in failing to make a finding with respect to the "reasonably prudent operator" rule. Our juris-

diction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1). We find no reversible error and affirm.

*Standard of Review*

We review chancery cases *de novo* on the record, but we will not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Slaton v. Slaton*, 336 Ark. 211, 983 S.W.2d 951 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999);*RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). *Crawford & Lewis v. Boatman's Trust Company*, 338 Ark. 679, 1 S.W.3d 417 (1999).

*Facts*

In 1985, TXO Production Company ("TXO") drilled a gas well in Sebastian County known as the Dill "A" #1 Well. TXO did so pursuant to leases it had acquired from the land owners in previous years. TXO shared lessee rights with Tiros Exploration Company ("Tiros") and Ross Explorations, Inc. TXO controlled 98.5% of the lessee rights while Tiros and Ross controlled the remaining 1.5% of the rights. The habendum clauses of each of the leases granted lease rights for a fixed term of years as well as for some indefinite additional period if the lessee maintained production. The leases contained a number of specific variations in their habendum clauses. However, the parties tried the case, and the trial court ruled on the apparently stipulated premise that each lease required that the lessee produce gas in "commercial paying quantities" in order to preserve lease rights beyond the term of years stated in the lease. The parties did stipulate that the term of years in all the leases had expired. At some point, Sonat Exploration Company ("Sonat") became successor to TXO's lease rights and operated the well until the spring of 1996. In the spring of 1996, according to Sonat internal company memoranda introduced at trial by Freedom, Sonat intended to cease all production from the well and abandon it. Sonat engineer B.M. Hickman recommended the well be plugged and abandoned due to low production and the well

being "uneconomic in its current completion." Sonat records indicate that the well produced at a rate of less than 10 MCF/D at that time. Sonat ceased all production from the well on April 30, 1996, when it "shut-in" the well. Sonat estimated it would cost $12,500 to plug and abandon the well. Also on April 30, Appellant Ross offered to purchase Sonat's interest in the Dill "A" #1 well for $1,000.00 in lieu of plugging the well. Sonat did agree at some point to sell its interest to Ross; however, Sonat did not assign its rights to Ross until August 16, 1996. Hence, no production occurred at the subject well from April 30, 1996, until September 1996 when Ross reopened the well. In May 1996, Freedom obtained "Options to Purchase Oil and Gas Leases" from the lessors of the Dill "A" #1 Well. These contracts entitled Freedom to purchase lease rights previously held by Sonat should the Sonat leases terminate for any reason.

The central conflict of this case is who controls the lease rights to the Dill "A" #1 well. Freedom alleged and proved to the satisfaction of the trial court that Sonat's lease interests terminated at some point prior to Sonat's assignment to Ross. Ross, on the other hand, contends that Sonat's lease rights remained in full force and effect when it acquired them via the August 16, 1996, assignment. The parties agree that the principal issue that resolves the dispute is whether or not the subject well ever ceased to produce in "commercial paying quantities" before Ross acquired its assignment from Sonat.

In reaching its conclusion that the subject leases had indeed expired, the trial court made forty specific findings of fact. The court relied upon documentary evidence from Sonat's files, including various company records, internal memoranda, and accounting data. The court also based its findings upon expert testimony offered by the parties, and trial exhibits produced by the parties. In particular, the trial court placed substantial weight upon Sonat engineer B.M. Hickman's memoranda and also upon the memorandum of Sonat geophysicist Quentin Danser. Danser's handwritten note indicated his opinion in March 1996 that the leases had probably already lapsed due to low production. The trial court evaluated the extensive accounting testimony put forth principally by Freedom and cross-examined by Ross. The court found Freedom's evidence based upon Sonat's records that the well's production had steadily declined over a course of years to be credible. More specifi-

cally, the trial court found that for a period of twenty-four months prior to the April 30, 1996 shut-in that the well operated at a net loss. The parties provided the court with four charts comparing revenue of the well to expenses of operating the well. In its decision, the trial court used Appellant Ross's chart, which the court deemed most favorable to Ross. During the relevant period, the trial court found that there were eight months of profit totaling $1,283.00, and sixteen months of loss totaling $1,890.00. Combining these two figures left a loss of $607.00 over the twenty-four-month period. The trial court concluded that Sonat's rights under its lease terminated prior to transfer to Ross and that Freedom's new leases gave Freedom rights to the gas.

On appeal, Ross asserts that the chancellor erred (1) by finding that costs exceeded revenue, (2) by using a twenty-four-month period, and (3) by failing to make a ruling on the application of the "reasonably prudent operator rule."

*Production in Paying Quantities*

At the trial of this matter, Freedom bore the burden of showing that the earlier leases terminated due to lack of production. *Perry v. Nicor Exploration*, 293 Ark. 417, 738 S.W. 2d 414 (1987). In other words, Freedom had to show the well ceased to produce in commercial paying quantities. Ross asserts Freedom failed to do this because the figures introduced into evidence by Freedom impermissibly included overhead as a cost, and therefore when subtracted from revenues produced by the well failed to show the actual production of the well under the habendum clause. Ross asserts the trial court erred in adding in costs that were not lifting costs, although they might be direct costs of operation.

In *Turner v. Reynolds Metal, Co.*, 290 Ark. 481, 721 S.W.2d 626 (1986), we considered whether a gas lease should be canceled due to "failure to produce in paying quantities." *Turner, supra*, at 482. We stated, "A provision in a habendum clause of an oil and gas lease requiring production, as in this lease, means production in paying quantities." *Turner, supra*, at 483. In *McLeon v. Wells*, 207 Ark. 303, 180 S.W.2d 325 (1944), we held the phrase, "and as long thereafter as oil or gas, or either of them, is produced from said lands by lessee," meant "production in commercial quantities...."

*McLeon, supra*, at 305. Commercial or paying quantities, we have said, is determined by what is profitable to the lessee. *Turner, supra*, at 483.[1]

Ross, based upon dicta contained in *Perry*, asserts this court has adopted a "lifting costs" test. The sentence Ross relies on states, "Cross-examination, however, revealed that he did not know if some of the expenses used in his calculations were directly related to lifting." *Perry, supra*, at 421. Ross also cites *Mason v. Ladd Petroleum Corp.*, 630 P.2d 1283 (Okla. 1981), as support, wherein the Oklahoma Supreme Court stated, "Only those expenses which are directly related to lifting or producing operations can be offset against production proceeds to determine whether a well is a producer."

We have not expressly adopted this test nor have we explicitly decided what is meant by costs directly related to lifting. Other jurisdictions have dealt with this question. The Oklahoma Supreme Court in *Stewart v. Amerada Hess Corp*, 604 P.2d 854 (1979), defined "lifting expenses" as "Expenses necessary to lift the oil from the ground." The Oklahoma Supreme Court also stated, "The term 'lifting costs' relates to a portion of the cost of producing oil and gas exclusive of drilling and equipping costs — the term defies a more precise definition." *Hinniger v. Kaiser*, 738 P.2d 137 (1987). The Supreme Court of Kansas seems to be in agreement that costs of drilling and equipping the well are excluded. *Texaco, Inc. v. Fox*, 228 Kan. 589, 618 P.2d 844 (1980). This is also true in Texas. *See Evans v. Gulf Oil Corp.*, 840 S.W.2d 500 (1992). In *Reese Enterprises, Inc. v. Lawson*, 220 Kan. 300, 553 P.2d 885 (1976), the Kansas Supreme Court stated, "Expenses which are taken into account in determining 'paying quantities,' include current costs of operation in producing and marketing the oil or gas."

■ The crucial issue, then, is whether the well, when appropriate expenses are deducted, turns a profit, however small. Costs of drilling and equipping the well are excluded, because they are not costs of operation of the well. In Kansas, marketing is a cost of operation, and apparently is often added in because without it there

---

[1] See also, 3 Williams & Meyers, *Oil and Gas Law* § 604.6(a) (1986) (stating that "the term 'paying quantities' has generally been defined as such production as will enable the lessee to realize a profit from the sale of oil, gas or other minerals after the marketing expenses and the current cost of operation are deducted").

is no production. *Reese Enterprises, Inc., supra.* Depreciation has been included as a cost of operation by some courts, but the "better view" is to exclude it as associated with the equipping of the well. Williams & Meyers, *Oil and Gas Law* § 604.6(b). Overhead is excluded by some courts as a cost. We agree with the view that what ought to be considered are "direct expenses attributable to the operation of the lease." *Reese Enterprises, Inc., supra.*

The trial court examined the accounting data put forth by the parties. He then relied upon the chart prepared by Ross using figures from Sonat's joint-interest billing statements. According to Ross's president, Tim Smith, the chart employed the cost figures furnished by Sonat less the following items that Ross contended should not be counted as direct operating costs: (1) administrative overhead; (2) "other"; (3) equipment rentals other than compressors; (4) environmental safety; (5) meals; (6) communication; (7) miscellaneous; (8) entertainment; and (9) allocated costs. The remaining costs included in Ross's chart are: Pumping labor; field labor; auto/truck; road/location; chemical treating; taxes; salt water disposal; product/equipment services; well services; services for leased eqipment; other and indirect services; and materials and supplies. These expenses are in accord with those set out by the Kansas Supreme Court in *Reese, supra.* Based upon Ross's figures, the trial court found that for the twenty-four-month period preceding April 30, 1996, the well was operated at a net loss. Consequently, it did not produce in commercial paying quantities and the leases terminated under their own terms.

Appellant has not shown that the trial court considered improper costs in deciding the well's lack of profitability. Ross asserts the Joint Interest in Billing Statements and the Profit and Loss Statements do not provide information from which one can determine the "lifting" or "direct" costs of production. Ross asserts the categories listed on the statements did not provide information about what exactly was included. Ross also asserts that their Exhibit N-10 was misunderstood by the trial court as representing what Ross believed the lifting/direct costs to be, when it was actually only a statement created with the categories removed that were clearly inapplicable as overhead, but the remaining categories are still unreliable because without actual invoices, it is impossible to determine the accuracy of what was charged to the operation of the well.

The trial court found that "Sonat maintains a computerized accounting system. Each Sonat operated well is assigned a property number. Revenues and expenses are then coded with the property number of well to which they pertain as they are entered into the accounting system's computer." The trial court also noted that the accounting information is used to bill non-operating lease holders and to generate the profit and loss statements.

■■ The evidence of costs came in by expert and lay testimony. The judge has broad discretion in admitting expert testimony. *Scott v. State*, 318 Ark. 747, 888 S.W.2d 628 (1994). And, as to credibility, "We have held many times that this Court will defer to the trial court's evaluation of the credibility of the witnesses." *Saforo & Assoc. Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999)(quoting *Crawford v. Dep't of Human Services*, 330 Ark. 152, 951 S.W.2d 310 (1997). The costs considered appear to be those reasonably associated with producing gas from the well. We hold, therefore, that the chancellor did not clearly err.

### Period of Time in Calculation of Operating Costs

Ross asserts that the trial court used too short a period of time for determining profitability. Ross also argues that periods after assignment of the lease to Ross should have been considered. Other courts which have faced this issue clearly disfavor an inflexible period in all cases. Instead, the determinations depend upon the facts of the particular case and the specific reasons production waned or ended. The trial court used Ross's Exhibit N-10, which covered the twenty-four months prior to Sonat's shut-in of the well on April 30, 1996. Under the facts of the instant case, we hold that period of time to have been reasonable.

In *Fisher v. Grace Petroleum, Inc.*, 830 P.2d 1380 (Okla. Ct. App. 1992),[2] the Oklahoma Court of Appeals dealt with a habendum clause that provided "as long as gas is or can be produced." In discussing the proper period for determining profitability, the Court stated, "The appropriate period for determining profitability is a time appropriate under all the facts and circumstances of each

---

[2] *See also Texaco, Inc. v. Fox*, 618 P.2d 844 (Kan. 1980).

case." The court then cited Kuntz, *The Law of Oil and Gas*, § 26.7 (1990), which states:

> The better rule precludes the use of a rigid fixed term for determination of profitability and uses a reasonable time depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease and thus to provide the information with which a prudent operator would take into account in whether to continue or abandon operation.

The *Fisher* court found a thirteen-month time period to be adequate.[3]

 It also cannot be ignored that Ross's predecessor in interest voluntarily ceased all production on April 30, 1996, due to the well's low production and it being "uneconomic." Voluntary cessation is a factor that some courts consider in determining whether a lease has been terminated. *Hunter v. Clarkson*, 428 P.2d 210 (Okla. 1967). At the time Ross acquired the rights, if any, that Sonat had, the well was "shut-in" for lack of production. It had a tag on it that indicated temporary abandonment. A handwritten memo dated March 14, 1996, noted "looks like the leases are probably gone anyway, with only 10MCF/D production." Under the facts presented here, we find no error in the trial court's use of the twenty-four-month period immediately preceding the well's shut-in by Sonat. Nor are we persuaded by appellant that the court should have considered production data for the well after Ross resumed production in September 1996. If the leases terminated at any time prior to that time, under their own terms subsequent production would be irrelevant.

### Reasonably Prudent Operator Rule

 Ross asserts that the trial court erred when it failed to rule on "whether a 'reasonably prudent operator' would have continued to operate the well, even assuming a loss in the two years prior to shut-in." Failure to obtain a ruling from the trial court is a procedural bar to our consideration of the issue. We have held on many

---

[3] In the *Reese* case from Kansas, eighteen months was considered an appropriate time period given its facts but the court clearly believed the period could be more or less given other facts.

occasions that we will not address the merits of an argument where the appellant has failed to obtain a ruling from the trial court. *Howard v. Northwest Arkansas Surgical Clinic P.A.*, 324 Ark. 375, 921 S.W.2d 596, (1996); *Haase v. Starnes*, 323 Ark. 263, 915 S.W.2d 675, 680 (1996); *Vanderpool v. Fidelity & Cas. Ins. Co.*, 327 Ark. 407, 939 S.W.2d 280 (1997). It is well settled that this Court will not address an argument where the abstract does not show that it was made in the trial court, *Webber v. Webber*, 331 Ark. 395, 962 S.W.2d 345 (1998), *and* ruled upon there. *Sanders v. Bradley County Human Servs. Public Facility Bd.*, 330 Ark. 675, 956 S.W.2d 187 (1997); *see also Skokos v. Skokos*, 332 Ark. 520, 968 S.W.2d 26 (1998); *Myrick v. Myrick*, 339 Ark.1, 2 S.W.3d 60 (1999). Viewing the current landscape of oil and gas law, it may well be advisable and appropriate for this court to adopt the prudent-operator rule. However, we will only do so when the matter is properly before us. It is incumbent upon the appealing party to obtain a ruling on an issue in order to preserve it for our review. *Fisher v. Valco Farms*, 328 Ark. 741, 945 S.W.2d 369 (1997); *Farm Bureau P.H. v. Fm. Bureau Mut. Ins. Co.*, 335 Ark. 285, 984 S.W.2d 6 (1998). Since there was no ruling below, we will not decide the matter here.

Affirmed.