Jean M. MADDEN *v.* Jon and Debbie ALDRICH

00-825 58 S.W.3d 342

Supreme Court of Arkansas
Opinion delivered November 1, 2001
[Petition for rehearing denied December 6, 2001.]

*Cross, Gunter, Witherspoon & Galchus, P.C.*, by: *M. Stephen Bingham*, for appellant.

*Boswell, Tucker & Brewster*, by: *Ted Boswell*, for appellees.

DONALD L. CORBIN, Justice. This is a tort suit brought against two attorneys for conduct that arose out of an adoption scam. In early October 1996, attorney Gordon Humphrey advised attorney Ed Webb that he represented a birth mother who wished to place her baby for adoption. Humphrey was employed by the Madden Law Firm at the time. Webb initially tried to place the baby with a Connecticut couple, but that did not work out. Soon

thereafter, Appellees Jon and Debbie Aldrich contacted Webb's office regarding information about adopting a child. Webb advised them that he knew of an expected child who was available but that they needed to take action immediately for fear that the child would be placed elsewhere. Upon Webb's advice, the Aldriches wrote two checks to Webb, totaling $7,500, for the birth mother's medical expenses and Webb's legal fee. Webb subsequently confirmed with Humphrey that he had a couple interested in adopting the baby, and he wrote Humphrey a check for $5,000. In January 1997, it was revealed that there was no birth mother or baby and there never had been. Humphrey later pled guilty to a federal criminal charge for his actions and was sentenced to two years' imprisonment.

As a result of the incident, the Aldriches brought suit against Humphrey and Appellant Jean Madden in the Saline County Circuit Court. The claim against Madden was that she, as his employer, had been negligent in the hiring, retention, or supervision of Humphrey. The jury returned unanimous verdicts against Humphrey and Madden and assessed compensatory damages of $100,000, which were apportioned between Humphrey (seventy-five percent), Madden (twenty-four percent), and Webb (one percent). Additionally, the jury awarded punitive damages of $1,000,000 against Humphrey. Madden appeals from that judgment and from the trial court's denial of her posttrial motions. She raises numerous points for reversal, one of which involves our construction of Ark. Code Ann. §§ 16-22-310 (Repl. 1999) and 16-114-303 (Supp. 1999). Our jurisdiction is thus pursuant to Ark. Sup. Ct. R. 1-2(b)(6). We affirm.

### I. Immunity

The first issue that we must address is Madden's assertion that the trial court erred in finding that she was not entitled to immunity under section 16-22-310 and its counterpart, section 16-114-303. Madden asserts that she is immune from the Aldriches' negligence claim because they were not her clients or Humphrey's. Thus, she argues that there was no privity of contract, as required under sections 16-22-310 and 16-114-303. The trial court found that there was direct privity through an agency relationship, namely that Webb was an agent of the Aldriches who contracted with Humphrey, who was Madden's agent, for the purpose of arranging an adoption. We agree with Madden that the trial court's finding of direct privity was in error. Nonetheless, we affirm the trial court's

ruling that Madden was not entitled to immunity because she was not being sued in connection with the performance of professional services.

■ Sections 16–22–310 and 16–114–303 were enacted by the General Assembly in Act 661 of 1987, and both sections are identical as they pertain to this case. In pertinent part, the sections provide:

> No person licensed to practice law in Arkansas and no partnership or corporation of Arkansas licensed attorneys or any of its employees, partners, members, officers, or shareholders shall be liable to persons not in privity of contract with the person, partnership, or corporation for civil damages resulting from acts, omissions, decisions, or other conduct *in connection with professional services performed* by the person, partnership, or corporation, except for:
>
> > (1) Acts, omissions, decisions, or conduct that constitutes fraud or intentional misrepresentations[.] [Emphasis added.]

This court has held that "[t]he plain language of Ark. Code Ann. § 16–22–310 requires the plaintiff to have direct privity of contract with 'the person, partnership, or corporation' he or she is *suing for legal malpractice.*" *McDonald v. Pettus*, 337 Ark. 265, 271, 988 S.W.2d 9, 12 (1999) (emphasis added). Similarly, this court has held that section 16–22–310 "enunciates the parameters for litigation by *clients* against attorneys[.]" *Clark v. Ridgeway*, 323 Ark. 378, 388, 914 S.W.2d 745, 750 (1996) (emphasis added). This court has not heretofore been asked to construe this provision in any situation other than actions for legal malpractice or professional negligence. Thus, the question of whether this immunity extends to situations in which an attorney is being sued as an employer for negligently supervising an attorney-employee is one of first impression.

■■ The basic rule of statutory construction is to give effect to the intent of the General Assembly. *Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001); *St. Paul Fire & Marine Ins. Co. v. Griffin Constr. Co.*, 338 Ark. 289, 993 S.W.2d 485 (1999). In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* If the language is plain and unambiguous and conveys a clear and definite meaning, there is no need to resort to rules of construction. *Id.* Notwithstanding, statutes will not be

given a literal interpretation if it leads to absurd consequences that are clearly contrary to legislative intent. *Id.*

In the present case, the suit was filed against Madden based on her actions or omissions as an employer pertaining to her supervision of her employee, Humphrey. The record reflects that the issue of immunity was presented to the trial court in a motion for summary judgment. In response to Madden's motion, the Aldriches submitted two depositions given by Madden, one from this case, and the other from a different case involving a similar adoption scam by Humphrey. In those depositions, Madden admitted that when she hired Humphrey, she was aware that he had previously had his law license suspended by this court. She stated that Humphrey told her that the suspension had been the result of a charge that he had co-mingled funds from his general account with those in his client-trust account. She indicated that she had been satisfied with his explanation of the suspension, and that, accordingly, she did not attempt to verify his recitation of the events. She stated that although she initially had no concern in hiring him, she later developed concerns when she received a telephone call from a client in December 1995. According to Madden, the client told her that he had paid Humphrey $1,500 but that Humphrey was not doing anything on his case. She said that she was concerned because the fee had not been deposited in the firm's bank account. She stated that she never felt comfortable with Humphrey's explanation that he must have stuck the money in his pocket and left it at his house. She stated that she believed that it was highly probable that Humphrey had taken the client's money for himself and that he only brought it back because he had been caught.

Madden also stated that during the first half of 1996, she had become concerned about Humphrey's depressed mental state, which included suicidal thoughts, and his bad financial situation. Regarding the former concern, she stated that she was afraid that he would miss a court date or other deadline. She then began to closely monitor his mail, and she started taping his office telephone calls. She indicated that she had a question about whether Humphrey might have been pocketing fees for himself, rather than bringing them through the firm, but she was never able to catch him at it. For all her concerns, Madden stated that she had thought about firing him, but she decided not to because she needed his cooperation and testimony in a lawsuit that had been filed against her.

■ Based on Madden's statements, the Aldriches argue that she is not immune from their negligence claim. They contend that sections 16-22-310 and 16-114-303 provide immunity to attorneys only when they are sued for legal malpractice or professional negligence. We agree that the plain language of these provisions demonstrates that the immunity provided is limited to suits based on conduct in connection with professional services rendered by the attorney.

■■ Here, the actions or omissions upon which this negligence claim is based do not fall within the parameters of professional services. Madden admitted that she was concerned that Humphrey might have been taking fees from clients and not sharing them with the firm. She also expressed concerns that he was taking money from clients and not providing any services for them. At a minimum, she admitted concerns that Humphrey's mental state during 1996 was such that she was afraid that he would miss important deadlines or court dates. These concerns and Madden's subsequent actions, or inactions, were not connected with the performance of professional services. It does not require an attorney's professional skills to suspect that another attorney may be stealing money, either from the firm or from clients. Accordingly, we hold that the immunity provided in sections 16-22-310 and 16-114-303 is not available under the facts and circumstances of this case. It is thus irrelevant that there was no direct privity of contract between Madden and the Aldriches. We will affirm the trial court when it has reached the right result, even though it may have announced the wrong reason. *See Ouachita Trek & Dev. Co. v. Rowe*, 341 Ark. 456, 17 S.W.3d 491 (2000); *Malone v. Malone*, 338 Ark. 20, 991 S.W.2d 546 (1999).

## II. Negligent Supervision

■ For her second point for reversal, Madden argues that there was not substantial evidence to support the jury's verdict that she was negligent in her supervision of Humphrey. She argues further that there was not substantial evidence that Humphrey was her employee. The jury's verdict reflects the finding that Madden was negligent in the hiring, retention, or supervision of Humphrey. We limit our review to the sufficiency of the evidence to support a finding of negligent supervision, as we believe that issue is dispositive. To affirm, we need only determine that there was substantial evidence to support the verdict, viewing the evidence and all reasonable inferences arising therefrom in a light most favorable to the

appellee. *Ethyl Corp. v. Johnson*, 345 Ark. 476, 49 S.W.3d 644 (2001). Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Id.*

 Liability for negligent supervision is based upon the unique relationship between employer and employee. *Regions Bank & Trust v. Stone County Skilled Nursing Facil., Inc.*, 345 Ark. 555, 49 S.W.3d 107 (2001) (citing *Niece v. Elmview Group Home*, 929 P.2d 420 (Wash. 1997)). Under this theory, employers are subject to direct liability for the negligent supervision of employees when third parties are injured as a result of the tortious acts of employees. *Id.*; *American Auto. Auction, Inc. v. Titsworth*, 292 Ark. 452, 730 S.W.2d 499 (1987); *Sparks Reg'l Med. Ctr. v. Smith*, 63 Ark. App. 131, 976 S.W.2d 396 (1998). The employer's liability rests upon proof that the employer knew or, through the exercise of ordinary care, should have known that the employee's conduct would subject third parties to an unreasonable risk of harm. *Regions Bank*, 345 Ark. 555, 49 S.W.3d 107.

██ ██ This theory is separate and distinct from the *respondeat superior* theory of vicarious liability, as a claim of negligent supervision does not preclude recovery where the acts committed by the employee are intentional and outside the scope of employment. *Titsworth*, 292 Ark. 452, 730 S.W.2d 499. In other words, a claim of negligent supervision "provides a remedy to third parties who otherwise would not be able to recover under respondeat superior because of the scope of employment requirements." *Sparks*, 63 Ark. App. at 135, 976 S.W.2d at 399 (quoting 27 AM. JUR. 2d *Employment Relationship* § 472 (1996) (footnote omitted)). As with any other negligence claim, to prove negligent supervision, a plaintiff must show that the employer's conduct was a proximate cause of the injury and that the harm to third parties was foreseeable. *Id.* It is not necessary that the employer foresee the particular injury that occurred, only that he or she reasonably foresee an appreciable risk of harm to others. *See Ethyl Corp.*, 345 Ark. 476, 49 S.W.3d 644; *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998). We turn now to the evidence presented on this issue.

The jury heard testimony on this issue from Janie Pelkey, Stan Batten, Ed Webb, Humphrey, and Madden. Pelkey testified that she had worked for the law firm from the middle of 1994 to June or July of 1996, and that she had been Humphrey's personal secretary. Pelkey characterized Madden's relationship to Humphrey as one of supervisor-employee. During her tenure, Pelkey became aware of

several occurrences involving accusations against Humphrey for taking money from clients and not doing what he was hired to do. On one of those occasions, she received a telephone call from a man who said that he had given Humphrey $1,000 to file suit on his behalf, and he wanted to know why the suit had not been filed. Pelkey reported this to Madden, and Madden told her she would take it up with Humphrey. On another occasion, Pelkey and Madden were seated adjacent to each other when Madden received a telephone call. Madden told Pelkey that the caller said that she had sent in money to be invested by Humphrey and she wanted to know the status of her investment. Again, Madden told Pelkey that she would ask Humphrey about the matter. As time went on, more complaints surfaced about Humphrey's work. The last occurrence that Pelkey recalled was when a client telephoned Madden and inquired about $4,000 that the client had wired to Humphrey regarding an adoption. When Madden asked her about the money, Pelkey told her that she was not aware of any money being sent for an adoption. Pelkey also testified to some unusual behavior by Humphrey. Particularly, she stated that a woman named Kim would come to the law firm once a week, and that Humphrey always talked to her in his office with the door shut. Pelkey stated that the woman would always leave with a check, and that she assumed that Humphrey was paying her off because he had not taken care of a legal matter for her.

Pelkey stated that as a result of the telephone calls from clients, the office sat down as a group, minus Humphrey, to determine whether the complaints against Humphrey were true. Pelkey stated that she and Madden discovered ledger sheets that did not match with what clients said that they had paid Humphrey. According to Pelkey, Madden told her that she was considering withholding money from Humphrey's paycheck to cover the missing amounts. At one point, Madden told Pelkey that she was going to fire Humphrey, and that she would send Stan Batten, the firm's paralegal, to retrieve the firm's belongings from Humphrey's house. All of these actions took place prior to June or July 1996, when Pelkey left the firm, and well in advance of the date that Humphrey took $5,000 from the Aldriches.

Batten testified, via videotaped deposition, that he had worked as a paralegal for the Madden Law Firm from late 1995 through May 1997. Batten initially corroborated Pelkey's testimony in a letter that he wrote to the Aldriches' attorney. He later wrote a second letter, however, stating that the first letter had been written under duress, due to the stress of his mother's recent death and the

alleged harassment that he had received from the Aldriches' attorney. During the deposition, counsel for the Aldriches attempted to impeach Batten's credibility with his inconsistent statements. Batten maintained that he had no information that would be material to this case. He revealed, however, that Madden was currently representing him in his bankruptcy case.

Ed Webb testified that he wrote a check to Humphrey for $5,000 based on his representation to Webb that his cousin was pregnant and wanted to place her baby for adoption. Webb stated that he and his office staff had repeatedly telephoned the Madden Law Firm during the month of October 1996, in an attempt to get in touch with Humphrey. He stated that he became aware of the fact that Humphrey had left the Madden Law Firm sometime during November 1996. Subsequently, Webb learned from another attorney that Humphrey had lied about the baby in the Aldriches' case and a couple of other cases. Webb finally confronted Humphrey about the situation in February 1997. Webb also testified that in dealing with Humphrey, he relied on the fact that Humphrey was working for Madden's firm at the time. He explained that he respected the Madden Law Firm's name and reputation and the firm's decision to hire Humphrey.

Humphrey testified that he worked for Madden as an independent contractor, and that his salary was based on a percentage of the gross amount of fees that he generated. He stated that he handled his own cases in the manner he wanted to handle them, and that Madden had no control over his cases. He admitted, however, that when he left the firm, his files, and presumably his clients, remained with Madden. He testified that during the middle part of 1996, while he was still working at Madden's firm, his "mental state had kind of turned to mush." He confirmed Pelkey's testimony concerning the incident in late 1995 involving the client who had complained that he had given Humphrey $1,000 or $1,500 to take his case and nothing had been done. Humphrey downplayed the incident, stating that he had taken the fee from the client on a Friday afternoon, and that he had cashed the check that afternoon and took the money home with him, since Madden had already left for the day. Regarding his misrepresentations to the Aldriches, Humphrey claimed that there was a baby available when he initially took their $5,000. He admitted, however, that he kept their money even after he became aware that there would be no baby for them to adopt.

Madden testified that Humphrey had worked for her law firm from 1992 through October 1996. She initially paid him an hourly wage, but later paid him on commission, giving him forty percent of the fees that he produced. She stated that he controlled his own cases, and that she only looked for the results. She admitted, however, that she had routine meetings with Humphrey wherein she would check on the status of his cases. She also admitted that there were situations where clients had called with complaints about Humphrey, and that she took it upon herself to check into them. She acknowledged the incident that occurred in late 1995, of which Pelkey and Humphrey testified. She concluded that there was nothing to this complaint and that the client was overly anxious about his case. She admitted that she was aware at the time she hired Humphrey that his law license had been suspended for one year for co-mingling client funds. She stated that the only knowledge she had of the reasons his license was suspended came from Humphrey himself, and that she had done nothing independently to verify his statements. She further admitted that she had Humphrey's office telephone tapped sometime around August or September 1996, but she denied that she had any reason to think that he was taking money from clients and not reporting it. She also admitted that on one occasion, she had asked Batten to follow Humphrey when he left the office. Perhaps more significantly, Madden admitted that she had received telephone calls from a woman and her aunt stating that they were having trouble getting in touch with Humphrey regarding his representation of a woman who was going to let them adopt her baby.

Excerpts from Madden's depositions, which were read to the jury, revealed that her office practices toward Humphrey changed after the 1995 incident involving the $1,000 or $1,500 fee taken by Humphrey. She stated that she became very observant of Humphrey after that happened. She paid attention to who called him, she watched his mail, and she tapped his office telephone. Her deposition also revealed that the reason she did not fire Humphrey was because she was being sued and needed his favorable testimony for that trial. Finally, when asked whether she had developed a suspicion that Humphrey may have been taking money from clients and not reporting it to her, Madden stated: "I knew something was wrong but I didn't necessarily think that was it."

The foregoing testimony constitutes substantial evidence that Madden was negligent in supervising Humphrey, and that her negligence was a proximate cause of the Aldriches' damages. The evidence demonstrated that Madden knew or, in the exercise of

ordinary care, should have known that Humphrey would act in a way that would subject third parties to an unreasonable risk of harm. It is of no consequence that she had no personal knowledge about Humphrey's misrepresentations to the Aldriches. She was certainly put on notice by the prior complaints that Humphrey was not performing his duties according to the rules of professional conduct. At a minimum, she knew that Humphrey had taken money from clients for specific purposes and had not used the funds accordingly. She knew that ledgers kept by his secretary were not matching up with what clients were telling her they had paid Humphrey. Moreover, there was evidence that she knew that Humphrey had taken $4,000 from a woman for purposes of arranging an adoption, and that the woman was having difficulty getting in touch with Humphrey about the matter. There was thus substantial evidence that Madden was negligent in supervising Humphrey.

■ ■ There was also substantial evidence demonstrating that Humphrey was Madden's employee. In *Blankenship v. Overholt*, 301 Ark. 476, 786 S.W.2d 814 (1990), this court set out ten factors to be considered in determining whether one is an employee or an independent contractor. The principal factor is the extent of control that the master may exercise over the details of the work. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas.*, 341 Ark. 317, 16 S.W.3d 545 (2000). It is the right to control, not the actual control, that is determinative. *Id.* Other factors include whether the one employed is engaged in a distinct occupation or business; whether the employer furnishes the tools and workplace for the job; the length of time the person is employed; and whether the work is part of the regular business of the employer. *Id.* Generally, the question of employment status is a question of fact for the jury to resolve. *See National Bank of Commerce v. HCA Health Servs. of Midwest, Inc.*, 304 Ark. 55, 800 S.W.2d 694 (1990); *Johnson Timber Corp. v. Sturdivant*, 295 Ark. 622, 752 S.W.2d 241 (1988).

■ ■ Here, the evidence showed that Humphrey worked for Madden for over four years. Madden supplied the workplace and the tools to enable Humphrey to practice law out of her office. Humphrey was clearly engaged in the same business as Madden, even though they may have had separate areas of specialty. More importantly, Madden had the right to control Humphrey's work. She had access to his case files, and she routinely reviewed them to determine the status of the cases. She further had control over his workplace, as she admitted that she had bugged his office and tapped his telephone. Finally, her testimony evidenced her belief that she had the ultimate right of control over him, as she indicated

that she could have fired him and had thought about doing so. Thus, there was substantial evidence to support the jury's finding that Humphrey was Madden's employee. It is of no avail that Humphrey may have initially been an independent contractor. This court has held that "when an employer goes beyond certain limits in directing, supervising, or controlling the performance of the work, the relationship changes from employer and independent contractor to master and servant." *Blankenship*, 301 Ark. at 478, 786 S.W.2d at 815 (citing *Meyer v. Moore*, 195 Ark. 1114, 115 S.W.2d 1087 (1938)). The evidence clearly demonstrates that the relationship changed around the time that complaints about Humphrey were being brought to Madden's attention.

■ Lastly, we are not persuaded by Madden's argument that proximate cause is lacking because Humphrey could have made the false representations about the baby regardless of whether he was working for her or was self-employed. This is pure speculation on Madden's part. The fact is that Humphrey was employed by Madden at the time that he made the fraudulent representations about the baby to the Aldriches' attorney. Moreover, this argument overlooks Webb's testimony that in trusting Humphrey's representations about the baby, he relied on the fact that Humphrey was employed by the Madden Law Firm. Proximate cause is defined as "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, *and without which the result would not have occurred.*" *City of Caddo Valley v. George*, 340 Ark. 203, 213, 9 S.W.3d 481, 487 (2000) (emphasis added) (quoting *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 181, 952 S.W.2d 658, 662 (1997)). When there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *Id.*; *Dodson v. Charter Behav. Health Sys., Inc*, 335 Ark. 96, 983 S.W.2d 98 (1998). Under the circumstances, we cannot say that it was error for the jury to conclude that Madden's negligence in failing to properly supervise Humphrey was a proximate cause of the Aldriches' injuries.

### III. Evidentiary Rulings

■ For her third point for reversal, Madden argues that the trial court erred in (1) allowing Janie Pelkey to testify; (2) admitting Batten's prior written statement; (3) allowing the Aldriches' attorney to read to the jury excerpts of Madden's deposition given in another case; (4) admitting a doctor's letter regarding Debbie Aldrich's health; and (5) refusing to allow Madden to introduce a

written chronology of events made by the Aldriches. We note at the outset that the decision to admit or refuse evidence is within the trial court's discretion, and this court will not reverse the trial court's ruling absent an abuse of discretion and a showing of prejudice. *See Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001); *Aka v. Jefferson Hosp. Ass'n, Inc.*, 344 Ark. 627, 42 S.W.3d 508 (2001). We find no merit to any of these claims.

 Madden first argues that the trial court erred in allowing Pelkey to testify, because she had no personal knowledge of Humphrey's misrepresentation to the Aldriches about the nonexistent baby. This argument is misplaced. The record demonstrates that Pelkey's testimony was confined to her personal observations of what had occurred at the Madden Law Firm and the communications that Madden had with her regarding client complaints about Humphrey. Her testimony was relevant to the issue of what Madden knew or should have known about Humphrey's actions. Accordingly, there is no error on this point.

 Madden next argues that the trial court erred in permitting the Aldriches to admit a copy of the first letter written by Batten to the Aldriches' attorney. She argues that the letter was prejudicial and that it should not have been admitted as substantive proof, because Batten had recanted the statements in that letter and had denied their truth in his videotaped deposition. The record reflects that Batten's deposition was played to the jurors in its entirety. The contents of the letter were read to Batten during that deposition, without objection from Madden. There is no prejudice in admitting evidence that is merely cumulative or repetitious of other evidence that is admitted without objection. *See Eliott v. State*, 342 Ark. 237, 27 S.W.3d 432 (2000); *Thompson v. Perkins*, 322 Ark. 720, 911 S.W.2d 582 (1995). Moreover, any concern about the improper use of this evidence could have been resolved with an instruction to the jury that the letter should not be considered as substantive evidence of the statements made therein, and that it should only be considered on the issue of Batten's credibility. Madden made no request for such a limiting instruction. When evidence is admissible for one purpose but not for another, an objection is wholly unavailing unless the party seeks an instruction to limit the evidence to its admissible purpose. *See* Ark. R. Evid. 105; *Kennedy v. State*, 344 Ark. 433, 42 S.W.3d 407 (2001). There is no reversible error on this point.

 Madden also asserts that the trial court erred in allowing the Aldriches' attorney to read into the record portions of her

deposition given in another case, wherein she was being sued as a result of another adoption scam committed by Humphrey. She argues that the excerpts were irrelevant and that there was no basis for allowing them into evidence. She does not deny that the statements were made by her, and she does not assert that she was prejudiced by their admission. As stated above, this court will not reverse absent a showing of prejudice. *Dodson,* 345 Ark. 430, 47 S.W.3d 866; *Aka,* 344 Ark. 627, 42 S.W.3d 508.

 Madden next challenges the trial court's admission of a letter written by Debbie Aldrich's physician, pertaining to her general health. The record reflects that the letter was admitted to rebut Madden's contention that Debbie had been less than forthcoming about her health to the social worker who performed their adoption home study. The contents of the letter were of no consequence to the claim against Madden. Indeed, the record reflects that Madden only objected to the letter on the ground that it was not properly authenticated and contained hearsay. The trial court denied the objection on the ground that it was not being offered for the truth of the statements made therein. Madden then asked for a cautionary instruction to the jury, and the trial court gave one. We are thus at a loss as to how Madden was prejudiced by admission of this evidence, especially since she received the alternative relief requested. *See Greene v. State,* 343 Ark. 526, 37 S.W.3d 579 (2001).

 Lastly, Madden argues that the trial court erred in refusing to admit a written chronology of events prepared by the Aldriches for their attorney. The chronology showed that the Aldriches may have believed, initially, that their attorney, Ed Webb, was partly to blame for their problems. Madden contended that the written statement was an admission by a party opponent and was relevant to her third-party complaint against Webb. Counsel for the Aldriches did not object to admitting the chronology, so long as it was read into the record as a whole. The trial court initially admitted the written statement, but later reconsidered that ruling. Madden has offered nothing in the way of convincing argument or legal authority that would demonstrate that the trial court abused its discretion in denying admission. This, alone, is reason to affirm. *See Dodson,* 345 Ark. 430, 47 S.W.3d 866; *City of Van Buren v. Smith,* 345 Ark. 313, 46 S.W.3d 527 (2001). Moreover, she has failed to demonstrate how that ruling prejudiced her, as she was allowed to use information contained in the chronology to impeach the Aldriches' testimony. We thus affirm the trial court's ruling on this issue.

## IV. Evidence of Similar Acts

For her fourth point for reversal, Madden argues that the trial court erred in allowing evidence showing that Humphrey had been involved in similar adoption scams around the same time that he deceived the Aldriches. She argues further that the trial court erred in denying her motion for mistrial. The evidence in question came in first through Jon Aldrich, then through Debbie Aldrich and Ed Webb. The Aldriches assert that Madden has failed to demonstrate any prejudice, because the evidence came out during her cross-examination of Jon Aldrich. They assert further that the motion for mistrial was properly denied because Madden failed to seek a cautionary instruction to the jury. We agree.

During cross-examination of Jon Aldrich, Madden's attorney, Mr. Bingham, asked the witness about the decision not to include Ed Webb as a defendant in their lawsuit. The following colloquy occurred:

> Q. Mr. Aldrich, you said you didn't sue Mr. Webb in light of the facts that came out. The facts didn't come out until after you filed this lawsuit, is that right?
>
> A. No.
>
> Q. What's not right?
>
> A. The facts started coming out in April of '96, actually March of '96 that there were other adoptions through the Jean Madden Law Firm —
>
> Q. I'm going to stop you right there.

A bench conference then ensued, during which the Aldriches' attorney, Mr. Ginnaven, argued that the witness should be allowed to answer the question. The trial court agreed and instructed the witness accordingly. The following then occurred:

> A. Okay, in March there's a newspaper article in —
>
> MR. BINGHAM: Your Honor, that's where he's going.
>
> THE COURT: Well, that's non-responsive.

MR. BINGHAM: I agree with you. Let me go with another question.

MR. GINNAVEN: Well, he — I'm sorry, I want to make the record clear. Mr. Bingham is asking and trying to impeach this testimony, why did he not sue Mr. Webb? He said he didn't know anything about other facts because they didn't come out until sometime later. Mr. Aldrich is trying to explain to the Jury how he became aware that Mr. Webb wouldn't be responsible because the same thing had happened to other couples. He's opened the door to this line of inquiry.

At that point, Mr. Bingham objected and asked for a mistrial based on Mr. Ginnaven's statements. The trial court denied the motion, and instructed the witness to answer the questions as asked.

██ It is well settled that a mistrial is a drastic and extreme remedy that should be granted only when there has been error so prejudicial that justice cannot be served by continuing the trial or when fundamental fairness of the trial itself has been manifestly affected. *See Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000); *Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998). The trial court has wide discretion in granting or denying a motion for a mistrial, and we will not disturb the court's decision absent an abuse of discretion or manifest prejudice to the movant. *Id.* A mistrial will only be granted where any possible prejudice could not have been removed by an admonition to the jury. *Id.* When there is doubt as to whether the trial court abused its discretion in denying a mistrial, a failure to request an admonition will negate a mistrial motion. *Id.*

██ Here, Madden has failed to demonstrate how she was prejudiced by the admission of the testimony, as she opened the door to this line of questioning. *See id.* The same thing can be said about similar testimony elicited during Madden's cross-examination of Debbie Aldrich. Moreover, any possible prejudice resulting from the testimony or counsel's statements could have been cured by an admonition to the jury. Because Madden failed to request a cautionary instruction or other admonition to the jury, we do not reverse the trial court's ruling on this issue.

Additionally, the testimony that Madden complains about from Webb was admitted without objection. Webb stated on direct that another attorney had told him that "most likely there was not going to be a baby in our case and a couple of others." Madden did not

object. In fact, when Madden did object later in Webb's testimony, she failed to obtain a ruling on her objection from the trial court. It is well settled that to preserve a point for appeal, a proper objection must be asserted at the first opportunity. *See Foote*, 341 Ark. 105, 14 S.W.3d 512; *Edwards*, 335 Ark. 470, 984 S.W.2d 366. Moreover, failure to obtain a ruling from the trial court is a procedural bar to our consideration of the issue on appeal. *See Barker v. Clark*, 343 Ark. 8, 33 S.W.3d 476 (2000); *Ross Explorations, Inc. v. Freedom Energy, Inc.*, 340 Ark. 74, 8 S.W.3d 511 (2000). Accordingly, we find no merit to this point, and we affirm.

### V. Motion for New Trial

For her fifth point for reversal, Madden argues that the trial court erred in denying her motion for a new trial on the grounds that (1) the Aldriches' attorney engaged in improper conduct during closing argument, and (2) the jury could hear remarks made by the attorneys during bench conferences. We do not reach the merits of the first argument, as the record reflects that Madden voiced no objection during closing argument. As stated above, to preserve a point for appeal, a proper objection must be asserted at the first opportunity. *See Foote*, 341 Ark. 105, 14 S.W.3d 512; *Edwards*, 335 Ark. 470, 984 S.W.2d 366.

Likewise, Madden's second argument is also procedurally barred. She contends that members of the jury were privileged to the content of bench conferences during the course of the trial due to the courtroom's sensitive microphone and sound system. Particularly, she contends that the jury heard discussions about an unrelated adoption. The trial court's order denying the motion for new trial does not reflect a ruling on this issue. The failure to obtain a ruling from the trial court is a procedural bar to our consideration of the issue on appeal. *See Barker*, 343 Ark. 8, 33 S.W.3d 476; *Ross Explorations, Inc.*, 340 Ark. 74, 8 S.W.3d 511. We thus affirm the trial court's denial of the motion for new trial.

### VI. Miscellaneous Points

The final points raised by Madden are that the trial court erred in (1) allowing the jury to vicariously impute Humphrey's liability to her, based on the theory of *respondeat superior*; (2) allowing the jury to assess liability for fraud; (3) allowing the jury to assess damages for mental anguish; and (4) instructing the jury that

Humphrey had admitted liability. We discuss these points together, as they are all premised on Madden's apparent misunderstanding of the jury's verdict against her.

The record reflects that the jury's verdict was based on Madden's own negligent conduct, not on her vicarious liability for Humphrey's actions under the theory of *respondeat superior*. The judgment reflects that the issues were submitted to the jury on six interrogatories, three pertaining to liability and three pertaining to the assessment and apportionment of damages. The second interrogatory provided: "Do you find from a preponderance of the evidence that Jean Madden was negligent for the hiring, retention, or supervision of Gordon Humphrey, as defined in the instructions, which was a proximate cause of any damages?" The jury answered unanimously, "Yes." This finding was the only basis for Madden's liability in this case. The interrogatories did not seek or create a finding of vicarious liability. Accordingly, there is no merit to the first allegation of error.

Similarly, there is no merit to Madden's argument that the trial court erred in allowing the jury to assess liability for fraud. The trial court did not instruct the jury as to fraud, and the jury did not make any finding of fraud against Madden. Indeed, Madden acknowledges that the jury was not instructed on this issue. There is also no merit to the argument that the trial court erred in allowing the jury to assess damages for mental anguish. The jury did not assess, nor was it instructed to assess, such damages against Madden. To the contrary, the jury was only instructed to consider such damages against Humphrey. Finally, we reject Madden's argument that the trial court erred in instructing the jury that Humphrey admitted liability for the damages sustained by the Aldriches. She contends that this instruction, combined with other alleged errors, prejudiced her because it allowed the full extent of Humphrey's intentional wrongdoing to be imputed to her. Again, there is no merit to this point because the jury made no finding of vicarious liability against Madden.

In sum, we affirm the trial court's ruling that Madden was not immune from civil damages, under sections 16-22-310 and 16-114-303, for her negligence in failing to supervise her employee, Humphrey. We also conclude that there is substantial evidence to support the jury's verdict against Madden for negligent supervision. We further find no merit to any of the allegations of error raised by Madden on appeal. We thus affirm the judgment against Madden.

Because we affirm on direct appeal, it is not necessary that we address the point on cross-appeal.

Affirmed on direct appeal; affirmed on cross-appeal.

BROWN and IMBER, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. I dissent from the majority opinion because the majority's interpretation of Arkansas's lawyer-immunity statute, codified at Ark. Code Ann. §§ 16-22-310 (Repl. 1999), 16-114-303 (Supl. 2001), fails to grant immunity to Ms. Madden as required by the plain language of the statute. In determining the meaning of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999); *Kildow v. Baldwin Piano & Organ*, 333 Ark. 335, 969 S.W.2d 190 (1998). The statute must be construed so that no word is left void or superfluous, and in such a way that meaning and effect is given to every word therein if possible. *Id.*

The clear meaning of Arkansas's lawyer-immunity statute is apparent upon examining the statute's plain language, one clause at a time. The statute begins by identifying those who may be eligible to benefit from the statutory immunity: "No person licensed to practice law in Arkansas and no partnership or corporation of Arkansas licensed attorneys or any of its employees, partners, members, officers, or shareholders. . . ." Ark. Code Ann. §§ 16-22-310(a), -114-303(a). This plainly identifies two classes who may benefit from immunity — an attorney and a partnership or corporation including its employees, members, or officers. *Id.* The instant case does not involve a partnership or corporation because the Madden Law Firm is a sole proprietorship. Therefore, this first phase of the analysis considers only Ms. Madden's actions as an individual attorney and owner of a sole proprietorship.

Next, the statute identifies the class of persons against whom immunity may be asserted — "shall [not] be liable to persons not in privity of contract with the person, partnership, or corporation. . . ." Ark. Code Ann. §§ 16-22-310(a), -114-303(a). The majority correctly concludes that the Aldriches are not in privity with Mr. Humphrey, Ms. Madden, or the Madden Law Firm. Because the Aldriches lack privity, Mr. Humphrey, Ms. Madden, and the Madden Law Firm have immunity to the extent provided by the statute.

Finally, the statute sets out what an attorney and a partnership or corporation, including its employees, members, or officers, are immune from: "civil damages resulting from acts, omissions, decisions, or other conduct *in connection with* professional services performed by the person, partnership, or corporation, except for . . . fraud." Ark. Code Ann. §§ 16-22-310(a), -114-303(a) (emphasis added).

We first examine the impact of Arkansas's lawyer-immunity statute on Ms. Madden as an individual attorney and as the owner of the Madden Law Firm, a sole proprietorship. The performance of professional services by a sole proprietor necessarily includes the performance of professional services by the sole proprietor's attorney-employees. The majority correctly concludes that Mr. Humphrey was an employee of Ms. Madden and that his actions were within the scope of his employment. Thus, when Mr. Humphrey performed professional services as an employee of the Madden Law Firm, professional services were being performed by the sole proprietor of the firm, Ms. Madden, even though the firm was excused from liability due to the fraudulent nature of Mr. Humphrey's acts.

Considering Mr. Humphrey's performance of professional services to be those of the Madden Law Firm's sole proprietor, Ms. Madden, and substituting her name in the appropriate places, the statute would read as follows: Ms. Madden (as sole proprietor of the Madden Law Firm) shall not be liable to the Aldriches, who are not in privity of contract with her, for civil damages resulting from her supervisory acts, omissions, decisions, or other conduct in connection with professional services performed by her through her employee, Mr. Humphrey. Clearly, the trial court below and the majority in affirming have failed to extend immunity to Ms. Madden as required by Arkansas's lawyer-immunity statute.

The majority goes to great lengths in describing the "acts, omissions, decisions, and other conduct" that Ms. Madden performed or failed to perform while supervising Mr. Humphrey's performance of professional services. The majority then concludes by stating that "[i]t does not require an attorney's professional skills to suspect that another attorney may be stealing money. . . ." The majority confuses the issue. While I agree that Ms. Madden's suspicions did not require an attorney's professional skills, her suspicions alone could not and did not constitute facts that could serve as the basis for a claim of negligent supervision. It was not her suspicions, but her "acts, omissions, decisions, and other conduct" taken as a

result of her suspicions that formed the basis of a negligent supervision claim, and those "acts, omissions, decisions, or other conduct" are exactly the type of activity for which the lawyer-immunity statute provides immunity.

If the Madden Law Firm were a partnership or corporation, Arkansas's lawyer-immunity statute would also grant Ms. Madden immunity as a "partner, member, [or] officer" of the firm. Under these circumstances, the employee actually performing the acts would be immune from civil damages for the professional services the employee provided unless the acts constituted fraud or intentional misrepresentations. Furthermore, a member or officer of the law firm would be immune from civil liability for supervisory "acts, omissions, decisions, or other conduct," if the supervisory acts were in connection with professional services provided by the employee-attorney.

Substituting the designations "employee-attorney" and "firm member" in the appropriate places, the statute would read as follows: Neither the employee-attorney nor any firm member shall be liable to the Aldriches, who are not in privity of contract with employee-attorney or firm member, for civil damages resulting from the firm member's supervisory acts, omissions, decisions, or other conduct in connection with professional services performed by the employee-attorney. As demonstrated by this analysis, if the Madden Law Firm were included within the category of a "partnership or corporation of Arkansas licensed attorneys," Arkansas's lawyer-immunity statute would immunize Ms. Madden, as the firm member, from liability for damages resulting from her supervisory acts in connection with professional services performed by the employee-attorney, Mr. Humphrey.

While the intent of the General Assembly is clear from the statute's plain language, a further examination of the General Assembly's intent, as expressed in the emergency clause of the enactment and by the codification of the statute in two different chapters of the code, demonstrates the inconsistency between the majority's opinion and the intent of the General Assembly.

The first question is whether the Madden Law Firm, a sole proprietorship, should be granted the same immunity as a partnership or corporation. Applying the statutory construction maxim "*inclusio unius est exclusio alterius*" (inclusion of one in a list is to exclude all others) the sole proprietor of the Madden Law Firm

would seem to be excluded from immunity for negligent supervision claims because her law firm is not a partnership or corporation. This interpretation would also exclude many, if not all, of the newer forms of business organizations, such as Limited Liability Companies. Such an interpretation leads to the absurd consequence that immunity would turn more on the type of business organization than on the specific factors identified in the statute, such as contractual privity. However, as the majority points out, "statutes will not be given a literal interpretation if it leads to absurd consequences that are clearly contrary to legislative intent." *See* majority opinion (Citing *Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001)). The intent of the General Assembly appears to have been to limit the liability of attorneys, regardless of business organizational form. *See* 1987 Ark. Acts 661, § 5 (emergency clause) ("the liability of . . . attorneys to persons not in privity of contract with them should be specifically outlined by legislative enactment . . ."). To interpret the statute otherwise would lead to absurd consequences the majority seeks to avoid.

An indication of the General Assembly's intent may be reflected in a statute's emergency clause. *See, e.g., Dinkins v. Department of Human Services*, 344 Ark. 207, 40 S.W.3d 286 (2001); *Haase v. Starnes, M.D.*, 323 Ark. 263, 915 S.W.2d 675 (1996); *Martin v. Frazier*, 291 Ark. 120 (1987). The lawyer–immunity statute was enacted by Act 661 of 1987. The emergency clause in the Act provided in pertinent part:

> It is hereby found and determined by the General Assembly that the liability of accountants and attorneys to persons not in privity of contract with them should be specifically outlined by legislative enactment; that this Act establishes the limits of such liability; and that this Act should go into effect as soon as possible. . . .

1987 Ark. Acts 661, § 5 (emergency clause). This emergency clause clearly sets out the General Assembly's intent to immunize attorneys from civil liability to those not in contractual privity with them unless specifically exempted by fraud or where the suing party is an intended and notified third–party beneficiary.

The majority appears to limit the immunity provided by the statutes to cases of legal malpractice; however, the enactment was codified in two separate chapters of the code. Section 16–114–303 is under a chapter entitled "Malpractice Actions," and a subchapter entitled "Accountants and Attorneys;" whereas, section 16–22–310

appears under a chapter entitled "Attorneys at Law," and a sub-chapter entitled "Rights and Liabilities." Codifying the Act in both the general chapter governing attorneys at law, as well as the specific malpractice chapter may be indicative of the General Assembly's intent to extend immunity to attorneys in cases of general civil liability as well as malpractice. Thus, the majority's attempt to limit the protections of the Act to only direct legal professional services, *i.e.*, malpractice, is inconsistent with the General Assembly's intent.

Furthermore, the immunity granted by the General Assembly extends not only to professional services, but also to "acts, omissions, decisions, or other conduct *in connection with* professional services." The majority's attempt to narrow the impact of Arkansas's lawyer-immunity statute to only professional services is clearly at odds with the immunity contemplated by the General Assembly's use of such a broad phrase. Had the General Assembly intended to limit the grant of immunity to only professional services, they could have easily done so.

Finally, the effect of the majority's decision is to open the floodgates to law suits against partners, members, and officers of legal business organizations by imposing liability on them for negligent or fraudulent actions taken by even the most junior attorney in the firm where the plaintiffs lack contractual privity with anyone in the firm. Ironically, under the majority's interpretation, a first-year associate who performs a negligent professional act would be immunized from civil liability while any other member, partner, or officer who had any kind of supervisory authority over the associate would be subject to suit for negligent supervision, even though the supervisor only suspected negligent acts by the associate. Such a result was clearly neither the purpose nor the intent of the General Assembly when enacting Act 661 of 1987.

For these reasons, I respectfully dissent. The judgment should be reversed, and the case against Ms. Madden should be dismissed pursuant to Arkansas's lawyer-immunity statute.

BROWN, J., joins in this dissent.